**TRINITY WATER RESERVE, INC., d/b/a Devers Canal System and Paul Glass, Individually and as President of Trinity Water Reserve, Inc., Appellants,**

v.

**Robert B. EVANS, Laverl Edwards, Helen Edwards, Steven White, d/b/a White Bros. Farm, Larry Armentor and Mark Armentor, d/b/a L & M Farms, Appellees.**

**No. 09–91–158 CV.**

Court of Appeals of Texas, Beaumont.

March 19, 1992.

Ronald Cook, Mayor, Day, Caldwell & Keeton, Houston, for appellants.

James K. Rourke, Jr., Austin, Don Taylor, Taylor & Norwood, Jay L. Arnold, Liberty, for appellees.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

This appellate procedure involves an interlocutory appeal from a temporary injunction which was granted by the 75th Judicial District Court of Liberty County. The appellees, named above, are farmers on the Devers Canal System. These farmers sued the appellants, named above, who are the new owner or owners of the canal system. Mr. Paul Glass, president and shareholder of the canal system, was also sued as a defendant. The plaintiff-litigants sought, inter alia, a clear and complete declaration of their rights as farmers to receive adequate water in a proper and timely manner from the Devers Canal System without having to sign a certain contract which had been demanded by the appellants. The appellees could not agree to the initially required contract.

The appellees argue that the proffered contracts of the appellants forfeit and vitiate the reasonable rates for canal system water. These reasonable rates, the appellees maintain, were obtained by them in a recent Texas Water Commission (Commission) proceeding, identified as Docket No. 8388–M. Appellees also argue that the

proffered contracts contained both unreasonable and overreaching terms and rates.

The appellees also requested and petitioned for ancillary, temporary, and later permanent injunctive relief in equity. A temporary injunction, as stated above, was granted by the district court.

### Skeletal Outline of Background Scenario

#### May 10, 1991 Hearing

A hearing was conducted on May 10, 1991. The hearing was conducted as a "temporary injunction temporary hearing". This May 10, 1991, hearing was conducted on the motions to stay the temporary restraining order, a plea to the jurisdiction of the court, and finally, a plea in abatement. The litigants tacitly agreed that the motion to dissolve the temporary restraining order was to be heard first.

At the May 10th hearing, Mr. Glass recollected that the first deposit required by the Devers Canal System varied from either $5 to $10. Mr. Glass further testified that the approximate overall percentages of the amount of the initial deposit was about 10 to 20% of the overall payment. We find in the record:

Q. Then when was the remainder of the money paid?

A. After the crops were harvested.

Q. I'm sorry?

A. After the crop was harvested.

Q. So approximately 10 percent paid up front and about 90 percent at the end?

A. Approximately.

Q. So last year was the first year, then, in which the farmers paid monthly payments to Devers Canal System for water; is that correct?

A. As far as my personal knowledge, yes.

This line of evidence is recited to demonstrate that the record reflects that the last peaceful, unlitigated, undisturbed and undisputed status quo was substantially and meaningfully different from the rates posted by the Devers Canal System and the Trinity Water Reserve, Inc. (TWRI). A

meaningful change is demonstrated by this testimony from Mr. Glass:

Q. What is the current payment schedule for water on the Devers Canal System?

A. Initial sign-up in April was 32.75. May 1st, like 18.75. June first is another 18.75, and I don't remember the rest of it. But the balance is due on—there is two more payments. Balance due on August 1st.

Many, numerous rice crops are *not* ready for harvesting by August 1st. When the president of TWRI testified that the way he interpreted the Commission rate, including a surcharge, this president, Mr. Glass, would place the rate at $93.83 per acre because although the Commission ordered $79 and some-odd cents, there was a $14 and some-odd cent surcharge, which brings the rate up to $93.83 per acre for canal water. This difference of approximately $14.46 is the difference between the $79.37 rate and the $93.83 rate. But this difference was the interpretation of Mr. Glass for certain extraordinary expenses. Mr. Glass conceded that this surcharge was not stated in any way in the Commission's Final Order. The record reflects from Glass:

Q. Is that stated anywhere in the Water Commission's final order?

A. Not that I'm aware of.

Q. So that's your own interpretation that that should be included; is that correct?

A. Not really, not just my interpretation of that order.

Q. Well, is there something in the order that says that you're entitled to the additional surcharge?

A. There is nothing in the order that says that I'm not.

Later, however, this same witness conceded as follows:

Q. So you don't know what the Commission's rates are?

A. Yes, I know what the Commission's rates are.

Q. What are the Commission's rates?

A. Right now they are—whatever the—

THE COURT: 79.37?

A. Yes, sir that's it. 79.37.

Q. (By Mr. Rourke) And then an additional $5 for the No. 3 relift?

A. Yes.

### May 21, 1991 Hearing

Clint Fancher was called to the stand. Mr. Fancher was a farmer and a rancher who had been farming rice for 17 years. He held an office with the American Rice Growers Association in the Anahuac division. He testified that in the Anahuac Canal System the water rate was $75.00 per acre payable October 1. No deposit was required. A strain or string of evidence existed to the effect that the policies and actions of the Devers Canal System were such that the farmers had no chance of a second crop or a second growth. A rule of thumb was that the rice had to be planted not later than April 20th of a year to be able to get a reasonably good chance of a second crop. The crucial April 20th date had passed. This witness testified that the price scheduled by the Devers Canal System was above that which the Water Commission said the farmers were to pay. Basically, the difference was $94.00 per acre posted by the Devers Canal System as distinguished from the $79.00 that the Commission had ruled that the rice cultivators were supposed to pay. Further, under the rules and regulations of the Devers Canal System there was substantial uncertainty and alarm as to when the liens upon the rice crop were going to be released by the canal system.

Stan Daley took the stand after being duly sworn. Daley testified about his making applications for needed water. He needed a lot of water immediately. He pointed out that a pipe going into one field of his was in need of repair. There was a section or part of the application that inquired as to any repair needs or maintenance needs that should be performed by TWRI. While these needs and repairs were being discussed by Daley and an employee of TWRI, Mr. Glass entered into the doorway of the office—"just barreled in the doorway and informed me that the canal system did not have the funds available to repair or replace the pipe." Then Daley asked Glass if the Devers Canal System had a backhoe available. Daley was thinking that it might be to his advantage to go ahead and purchase the pipe himself if he could get a backhoe to put it in place. Daley was informed by Glass that there was only one backhoe in the system and that at this particular time apparently all the farmers needed water at the same time and the requests for the use of the backhoe were so heavy that Mr. Glass simply could not assure Stan Daley when the backhoe would be available.

Daley further testified that he felt a real need to switch some of his rice acreage and some of the farms that he managed off of the Devers Canal System because Daley lacked a basic feeling of security. Daley simply did not feel that he was in a secure position where he could get the proper care and the proper water for his crop during the entire rice growing season. There simply were no guarantees that this farmer, Daley, could get enough water through the whole year for a large number of acres of rice. Daley's evidence pointed out that a rice farmer needs water throughout the growing season, especially when the rice is going into the boot which means that it is beginning to make the grain or grains. It is crucial to have ample water when the rice starts to make a head or begins going into a panicle differentiation. At panicle differentiation time a farmer definitely needs water. The farmer must obtain water. Without water, the farmer simply has no fruit and no grain. Hence, the farmer has no rice crop. At times a little head comes out but it doesn't fill out. It's small and it is not profitable and your profits for that year are very low to non-existent. This so-called "heading out" time usually takes place in July, but it can come as late as August.

Mr. Paul Glass also testified at this hearing. Because of certain drops or decreases in the acreage to be farmed on the Devers Canal System for the TWRI to receive the same revenue, the rates would have to be increased to produce the same total revenue.

A. (By Mr. Glass) At this point in time it would have to be a hundred one to a hundred two dollars an acre.

Glass testified that he had posted a rate set for 1991 water for the Devers Canal System. Currently, the rate was $93.83 on the Main and $5.00 additional for the No. 3 relift. The Commission's rate was something around $79.00. Mr. Glass testified that owners of approximately one-half of the acreage within the Devers Canal System had signed the proffered written contracts. Actually the farmers that signed up represented approximately 4,500 acres which was slightly under half of the acreage anticipated. This factor is relevant to TWRI's solvency as well as the adequate remedy-at-law issue. He further testified that the UCC–1's and the security agreements had also been signed by these same farmers which gave lien security to the canal system. But the record before us seems clear that the amount of the water rate under the TWRI's contract was definitely higher than the water rate ordered by the Texas Water Commission, which said Order was in full force and effect, at least as of the date of the oral submission of this appeal before this Ninth Court of Appeals.

At this point in the hearing, the district judge observed that probably the basic problem from the first minute of this dispute has been that really, the farmers had not actually signed a written contract. The proposed contract demanded much higher rates and a definitely accelerated payment schedule. The basic problem was that the farmers objected to signing the written contract that had been offered (by TWRI) which had the higher prices for water in it and that these higher prices were above the price ordered by the Texas Water Commission. And of paramount consideration was the crucial factor that numerous rice crops could not be harvested by August 1, the date of the final, full payment.

The chancellor felt—and he so expressed—that the farmers would sign the contract if the contract provided for the rates that were currently in effect, even with the proviso that the rates could go up after the litigation in the Austin Court of Appeals was concluded. The trial chancellor said: "I think everybody would go home and we'd all be happy."

Very shortly thereafter during the hearing, the equity chancellor further observed:

Well, I didn't want to sidetrack us. What sidetracked us, and it was me that did it, was Mr. Glass is saying that he needed that UCC–1 and the contract. Now, it may be convenient for him. But I wanted to get myself clear that at the point that that is not the law, that his contract is not—his lien is not a contractual creature such as a chattel mortgage or a deed of trust. It is a statutory lien.

It appears clearly that the increase in the rates as proposed by the canal system would increase the overall income to a figure between $75,000 and $100,000 additional gross income depending upon the final acreage that was to be planted in rice.

Furthermore, as we perceive the record before us, a letter was sent out on or about April 5 or 6, being a day or two after District Judge Dibrell of Travis County had signed a final judgment in the case before him and at the same time the Texas Water Commission had issued its notice of appeal and fully effected a supersedeas. However, this date may have been either April 6 or May 6, the point being that TWRI and its president were at least aware that the rates, rules and regulations they set forth, promulgated and posted were posted after Judge Dibrell's final judgment and also after the Texas Water Commission had perfected its appeal and its effective supersedeas. Concerning the top rates, an interesting colloquy took place between the court and Mr. Glass:

MR. ROURKE: Pass the witness.

THE COURT: Mr. Glass, what disturbs me is even if you got $93 and whatever cents, you posted plus the five more, acreage that's on the No. 3 relift, even if you got all that money for the projected 9300 acres, you're still going to lose money in '91, because it would have taken 102 or 103 to meet the level of income anticipated or projected for 1990?

THE WITNESS: Yes, sir.

THE COURT: What's wrong with that?

THE WITNESS: It won't work. That's why the security that the canal system needs is the revenue to make sure it operates, not a surety bond. It needs the revenues.

THE COURT: All right. But is it true, though, is what I said true?

THE WITNESS: Yes, sir.

THE COURT: Are you going to lose money even if you got the 94—$93, or has the resulting loss of acreage to serve also reduced some costs so that you feel you can break even moneywise?

THE WITNESS: That's difficult for me to say. For one, I think we'll have some more acres. I'm not sure. But what you have to remember is when I posted these rates, this was under the assumption that the farmers, between myself and the farmers we were estimating around 11,500. And so, if we do what we normally do and be able to change the rate according to the amount of acres, and what I could do at this point in time even is increase the rate another 5 or $10, and then, yes, we would be at the point that it would be a break-even deal.

THE COURT: Now that break-even deal, you're counting the $160,000 lease payment and the 60,000 management fee, which the Commission said you were entitled to include?

THE WITNESS: Yes, sir. That scenario, yes.

After further question and answer:

THE COURT: All right. Well, I take it, then, that you're not taking the position in this hearing that if the Court forces you to do—comply with 8388, that it's going to be economically impossible?

THE WITNESS: No, sir. I don't think that's my contention. My contention is, is what everybody needs is security of the system to operate. And the security of the system to operate is in the security it receives, not in surety bonds and not in them saying it will and me saying it will.

In fact, Mr. Glass was asked:

Q. Is there anything in the Texas Water Commission order that requires you to take anything other than full money up front?

A. None that I'm aware of.

This pronouncement was certainly a drastic change and a dramatic one in the status quo.

The appellees, plaintiffs below, also petitioned to declare their rights to receive and to use appropriate and adequate water from the Devers Canal System under both statutory law and common law, as well as their rights in accordance with and pursuant to a December 12, 1990, Order of the Texas Water Commission,[1] without the necessity of executing a formal, water-supply contract. The farmers make rice crops. They are customers or users of the Devers Canal System. The farmers allege that they are owners and holders of legal and possessory interests in land adjacent and contiguous to the various canals, ditches, flumes, laterals or reservoirs comprising the above-named canal system. The said system is located mainly in Liberty County but also serves to some extent Chambers County and the western part of Jefferson County.

TWRI is a Delaware corporation properly licensed to do business in Texas, with its registered agent located in Liberty, Liberty County, and its principal place of business on U.S. Highway 90 in Devers, Liberty County. Paul Glass is a resident of Liberty County.

The rice farmers allege and maintain that TWRI is expressly obligated and under a duty to provide water through the canal system on a continuing basis under and pursuant to the Commission's Final Order dated December 12, 1990, which, it is pleaded, is still in force and effect. The Order requires the TWRI to provide irrigation water through the Devers Canal System on a continuing basis; however, the Order does not require the farmers to exe-

---

**1.** [Editor's Note: The text of footnote 1 is pub-      lished at the end of this opinion.]

cute an irrigation or water contract or any other formal document, save and except a reasonable application made for water, as the only prerequisite to the enforcement of the Commission's Final Order. Basically and generally, the appellees aver and maintain that they have fulfilled all the necessary requirements to entitle them to the water from the canal system under several theories of law and under several bases of recovery. The appellees have offered and continued to offer to pay to the TWRI an initial amount of $32.75 per irrigated acre for the initial delivery of water. This amount of $32.75 was set by TWRI. The appellees allege that they are in full compliance in all respects with the posted rules and regulations of the canal system posted on March 11, 1991, with the sole exception of the requirement that the farmer sign a contract and execute a formal document described as a UCC-1.

The farmers allege that the TWRI refused to supply the water through the Devers Canal System unless the farmers signed an irrigation contract or other certain documents. Moreover, the farmers aver that TWRI fails and refuses to abide by the December 12, 1990, Order of the Commission. Appellees pleaded for equitable and injunctive relief stating that the rice crop planting season was fast coming to an end and they needed water immediately. Appellees aver that they would suffer imminent, irreparable injury and that these injuries and damages are actual and substantial to the property and to the other rights of the appellees. Furthermore, appellees claim that because of the very nature of these injuries and damages, the same are not measurable by any certain or reasonably definite pecuniary standard or standards and cannot be adequately compensated for in damages. Appellees maintain that in reality they have no actual, adequate, and meaningful remedy at law.

Various other relief was petitioned for and on May 8, 1991, at 3:05 o'clock p.m., the Honorable J.C. Zbranek, Judge Presiding, issued an "ORDER GRANTING TEMPORARY RESTRAINING ORDER". A further hearing was set upon the said pleadings and applications of the plaintiffs

for 9:00 o'clock a.m., May 21, 1991, in the 75th Judicial District Court of Liberty County. An accompanying "WRIT OF INJUNCTION" was issued on May 8, 1991, by the Honorable Joy McManus, District Clerk of Liberty County. On May 10, 1991, the defendants' motion for a stay of the temporary restraining order was denied; the defendants' plea to the jurisdiction of the district court was denied; the defendants' plea in abatement was denied and the defendants' motion to dissolve the temporary restraining order was denied.

The defendants below pleaded that the plaintiffs had come into court with unclean hands and were not entitled to equity. Further, that the plaintiffs could not demonstrate that they did, indeed, have a probable right upon a final trial to the requested relief. The defendants pleaded that the plaintiffs could not demonstrate that they would suffer an irreparable injury absent or lacking injunctive relief; and further, that the plaintiffs did actually have an adequate remedy at law as set forth in TEX. WATER CODE ANN. § 12.013 (Vernon 1988). Other defensive pleadings were set forth. The appellants concede in their various motions and pleas described above that after some lengthy hearings, the Commission did enter a Final Order in December of 1990, continuing and containing a 1990 water rate, and in addition in the Final Order, the Commission ordered that the TWRI provide continuous service to the farmers in the future at the same rate set by the Commission for the year 1990.

TWRI appealed the Commission's Order to the 126th Judicial District Court of Travis County in Cause No. 91–1519. The Travis County District Court affirmed the Commission's Order except to the extent the Order purported to set rates for 1991 and thereafter. The Travis County District Court held that the Commission lacked jurisdiction to set water rates in the future or prospective water rates.

However, on May 6, 1991, the Texas Attorney General's Office filed a notice of appeal of the Travis County District Court's judgment. The attorney general appealed on behalf of the Texas Water

Commission. By this same filing of the notice of appeal, and a supersedeas, that was adverse to the Commission's Order, the Texas Water Commission has suspended the enforcement of that portion of the Travis County District Court's judgment. The appeal from the Travis County District Court was taken to the Third Court of Appeals sitting at Austin, where we have been advised the same is still pending. It was demonstrated that the Texas Water Commission is a party that is entitled to appeal and to supersede the district court's final judgment without the necessity of giving security. Notice was given that the Travis County District Court's final judgment was and is superseded.

On May 22, 1991, an "ORDER OF TEMPORARY INJUNCTION" was signed and rendered by Judge Zbranek. After due notice and a hearing, the District Court of Liberty County in its "ORDER OF TEMPORARY INJUNCTION" found and concluded that the farmers would probably prevail on the trial of the cause on the merits and that the TWRI intended to disrupt or cease the supply of water to the plaintiffs and to the other farmers who depend upon the Devers Canal System. If a temporary injunction were not granted by the court, then the TWRI would carry out its stated intentions, thereby altering in a very substantial way the status quo. This would tend to make ineffectual the judgment if one were obtained in favor of the plaintiffs. Because unless the TWRI is deterred from carrying out its stated intentions of disrupting or ceasing the supply of water to the plaintiffs and other rice farmers depending on the same canal system these farmers would suffer imminent and irreparable harm and would be without an adequate remedy at law to compensate them for their injuries and damages. Simply put, a successful rice crop could not be made and be harvested. Nature and the growing season for rice could not be postponed. Additionally, the amount and nature of the damages and injuries could not be reasonably calculated due to the fact that at the time of the temporary injunction the rice crops were at various stages of development.

The temporary injunction provided for the customer farmers to submit to the TWRI a written application which would set forth the total amount of acreage which each farmer intended to farm. The application amount of $130 shall be paid by each plaintiff and other farmers who make this application. The $130 application fee shall be paid on or before June 1, 1991. By the same order the TWRI was commanded to desist and refrain from withholding the irrigation water under the terms of the said temporary injunction. Other relief was granted. Inter alia, the customer farmers were not required to execute any written contract, security agreement, UCC-1 form, or any other documentation other than an application for water and the TWRI was ordered not to deny, withhold, or delay the providing of water in accordance with the temporary injunction until at least October 15, 1991, or such later times as the various rice crops were finally harvested. A bond was provided. The plaintiffs' suit for declaratory judgment and other relief was set for hearing on the merits for October 7, 1991.

Hence, this appeal was taken from the granting of the said "ORDER OF TEMPORARY INJUNCTION".

The appellants concede in their brief that the plaintiffs are rice farmers who are consumers of water from the canal system and whose properties abut the canal system. The appellants further advance the proposition that although the district court took the position that it was simply enforcing the terms of a valid and subsisting order of the Texas Water Commission, nevertheless, the Liberty County District Court (according to the appellants' position) did in actuality impose and draft a contract for all of the litigants. The trial court's temporary injunction order sets out certain specific payment terms and amounts along with a certain schedule of payments.

The appellants dogmatically maintain:

The injunction therefore constituted an abuse of discretion. The trial court had no jurisdiction to enter the injunction, the legal requirements for injunction were

not met, and a proper balancing of the harms required the court to refuse to grant the injunction. This court should therefore vacate the injunction.

█ Appellants' point of error number one sets forth that the trial court erred in granting the temporary injunction because the said trial court did not have subject-matter jurisdiction. The appellants set out in their brief that the Devers Canal System is an irrigation system that is owned and operated by Trinity Water Reserve, Inc., and that the appellant, Mr. Paul Glass, is the president thereof and the sole stockholder of TWRI. Also, that pursuant to an agreement with the City of Houston and the Trinity River Authority of Texas, this canal system diverts state water from the Trinity River and then pumps it through a main canal system and also serves certain higher elevations of rice fields through a re-lift system.

Then on February 1, 1990, TWRI set the water rates for that particular year. However, a group of rice growers in Liberty and Chambers Counties filed a petition on February 20, 1990, with the Commission, requesting that the Commission review the water rates that had been set by TWRI.

Appellants are relatively recent purchasers of the canal system. The appellants began to actively operate the same. Beginning in about January of 1990, certain disagreements and disputes arose between the appellants and the rice farmers, whose land touched upon and was contiguous to the canal system. The disputes and disagreements arose over water rates, the releases of crop liens, and the rights under various theories of recovery of the farmers to receive adequate and timely irrigation water from the canal system. In mid-February of 1990, a group or organization of farmers protested the substantially, if not drastically, increased water rates as published by the appellants. This same group of farmers petitioned the Commission to set reasonable, just and non-discriminatory interim rates and also final rates for 1990 and thereafter. These petitions and requests for relief were made pursuant to the Texas Water Code. TEX. WATER CODE ANN. §§ 11.-036–11.041, 12.013 (Vernon 1988). These requests for relief, as we perceive them, were addressed to the Commission and were only relevant to reasonable, just and non-discriminatory water rates. Indeed, these requests did not involve the water rights of the farmers. These water rights of the farmers were really not contested by the appellants save and except as to the rates to be charged for water. *See and compare* TEX. WATER CODE ANN. §§ 11.036–11.041, 12.013.

The prices, terms and rates of a contract involving conserved or stored water shall be just, reasonable and without discrimination. A person or association of persons having possession of and in control of certain types of water may—but it is not mandatory—contract to supply the said water to any other person. Section 11.036. The water suppliers are subject to certain rules and regulations. Any entity or corporation or irrigation district supplying water shall make and publish reasonable rules and regulations relating to the method of supply, the use and distribution of the water, as well as the procedure for applying for the water and for paying for it. But these suppliers are to make and publish reasonable rules relating to water conservation and usage. Section 11.037. Again, it is emphasized that the prices, the terms of the contracts, the rates, the rules and regulations are to be reasonable and just.

Interestingly, § 11.036 does not mandatorily require a written contract to supply water. Nor does this section give to the supplier the power and prerogative to demand a written contract before supplying water. The verb used is "may". This language is permissive. Appellants agree in their brief that the contiguous land owners, being farmers, had a right to acquire the use of the water to irrigate their rice crops. The area was used for the cultivation of rice for many years, if not decades. Section 11.036(b) provides that a rate determined by the Commission must be just and reasonable and that rate is also subject to court review as in other cases.

It is clear and significant that the procedure for applying for the water and even

for the paying for the water must be under reasonable rules and reasonable regulations. Section 11.037(a)(3).

The legislative intent, as expressed through an actual statutory enactment, provides that a person who owns or holds a possessory right in any land adjoining or contiguous to a canal, ditch, flume or other parts of a canal system, and who has secured a right in the past to use the water of the canal, ditch, or other parts of the canal system, is entitled to be supplied from the canal system. Section 11.038 of the Water Code is entitled "Rights of Owners of Land Adjoining Canal, Etc." And the person is entitled to be supplied irrigation water for his or her land. *See* § 11.-038(a). Paramount and significant is § 11.-038(b) of the Water Code which mandatorily provides that if a person or corporation owning or controlling the said water and the person who owns or controls a possessory interest in the land adjoining cannot agree on a price for the permanent water right or for the use of enough water for irrigation of that person's land or for other purposes including the raising of stock; then, nevertheless, the party owning and controlling the water, if that said party has any water that is not contracted out to others, shall furnish the water necessary for all of the purposes listed in § 11.038 at reasonable and non-discriminatory prices. The word "shall" and the phrase "shall furnish" are mandatory. Section 11.038(b) became effective on September 1, 1977. While § 12.013, entitled "Rate–Fixing Power", does require the Commission to affirmatively affix reasonable rates for the furnishing of either raw or treated water; nevertheless, § 12.013 limits the power of the Commission in some respects. For example, the Commission's jurisdiction relating to incorporated cities, towns and villages shall be limited to water furnished on a wholesale basis. Section 12.013 shall not affect the jurisdiction of the Public Utility Commission. Nothing in this section prohibits a constitutional district court of general jurisdiction from exercising its broad, equitable powers.

Significant and crucial is the glaring fact that the Commission reduced the water rates to $79.37 per irrigated acre on the Main Canal and to $84.37 per irrigated acre on the Number 3 Relift section of the canal system, and with a one-time charge only of $6.29 per acre surcharge for the year of 1990. This was the Final Order of the Commission dated and set forth on December 12, 1990.

As we read the record, the appellants were insisting upon a $130 fee paid in cash to accompany the written application for water and that the appellants in March of 1991 demanded payment of the water rates at the rate of $93.83 per acre on the Main Canal, and $98.83 per acre on the Number 3 Relift section of the canal system. Furthermore, the appellants had required the farmers to sign a written contract that would bind the farmers and obligate them to the payment of these rates; that is, the $93.83 per acre rate and the $98.83 acre rate in full by the date of August 1, 1991, which was usually prior to the harvesting of the rice crop, or most of it. Appellants' demands included the payment also of about one-third or $32.75 per acre of the total rate upon making the application for the water without any corresponding agreement, promise or security from the appellants to make an expeditious and reasonably ready refund of any overpayments, if indeed, the rates as set by the Commission were upheld by the Third Court of Appeals at Austin. As well, the appellants commenced to impose certain supplementary fees and requirements, which were additional in nature, upon the farmers through certain amendments and changes to the canal system's regulations.

Prior to the operation of the Devers Canal System by these present, quite recent appellants, the farmers that used the irrigation water paid usually about $5 to $10 per acre in cash upon applying for the water and then paid the remainder due upon the actual harvesting of the rice crop. Inasmuch as the farmers declined to sign these new and drastically different contracts containing the water rates in the amounts of approximately $93 per acre and $98 plus per acre, the appellants then refused to provide water to the farmers who

would not sign the appellants' proffered 1991 written irrigation contracts. This refusal to provide water is acknowledged by the appellants in their brief.

The Liberty County District Court proceeding involves the rights to water for irrigation; this is not a water rate case. The rate case was before the Commission and is now pending on appeal in the Austin Court of Appeals. We determine that the subject-matter jurisdiction of the proceeding in Liberty County is one relevant to and germane to the statutory and common law rights to obtain irrigation water on behalf of the farmers who are customers of the canal system and who are owners and possessors of contiguous rice land. The lawsuit deals with the question of sufficient and continuous water service from the canal system for the irrigation, the cultivation, and of course, ultimately, the harvesting of the various rice crops.

Predecessor statutory enactments have been in place and interpreted as far back as 1905. These interpretations and constructions have dealt with the relative rights of the owners of the water and the farmers. The rights and powers of the water supplier, or the corporation, does not exclude the idea or eviscerate any duty and thereby make the interests of others wholly dependent upon the corporation's will.

All persons who own or hold a possessory right or title to land contiguous to any canal and who shall have secured a right to use the water, shall be entitled to be supplied with water. Indeed, in cases of shortages of water from a drought, or other natural phenomena, the water shall be divided among all the customers on a pro rata basis according to the amount that he or she or they may have been entitled.

With the sale or the long-term usage of a permanent water right, an easement is constituted and made involving the irrigated land which said permanent water right is such an easement which will pass with the title to it so that the owner of the irrigated contiguous land shall be entitled to water upon the terms provided in his contract. Or, if no contract is entered into, then, nevertheless, the rice cultivator shall be entitled to the irrigation water at just and reasonable rates.

■ This type of easement that shall pass with the title to the land has been referred to as a covenant running with the land. Indeed, common carriers and even others who are engaged in certain public callings have the power to contract. But these entities and these powers to permissibly contract cannot be so employed as to absolve them from their duties to the public or to deprive others of their water rights. *Borden v. Trespalacios Rice & Irrigation Co.*, 98 Tex. 494, 86 S.W. 11 (1905).

In *Borden, supra*, Justice Williams, writing for a unanimous Court, concluded in substance that the acts of the legislature before him which authorized the organization of a corporation for the construction of reservoirs and ditches; for the furnishing of water to persons entitled thereto for irrigation; and to make contracts for the sale of permanent water rights, or merely to lease, or to rent, or to otherwise dispose of irrigation water, also carries with it and provides that all persons possessing land *adjacent to any said ditch shall have a right of water for any of the purposes including irrigation and certainly, we hold, irrigation of rice at just prices.*

Indeed, the business operation and enterprise conducted by TWRI cannot be regarded as a purely private enterprise simply because it is seriously affected with a public interest. The basic purpose of permitting corporations such as TWRI to conduct their business under the statute is to enable such a corporation to furnish water for certain specified purposes to those who are entitled to receive the same.

■ The furnishing of this water can be done under a contract between the parties—but a written contract is *not necessary*. But if a contract cannot be agreed upon, then those owning or holding a possessory right or title to the land adjoining the canal or any of its parts, are entitled to water at just and reasonable rates. *American Rio Grande Land & Irr. Co. v. Mercedes P. Co.*, 208 S.W. 904, (Tex. Comm'n

App. 1919, judgm't adopted). It is very interesting to note that the Commission held:

It being the duty of defendant under the statute to furnish plaintiff with water for irrigation, it could not by contract limit its liability for negligently failing to furnish same to an arbitrary amount, regardless of the damage actually suffered....

....

*Defendant under the irrigation act, without contract, was obligated to deliver water to plaintiff for the purpose of irrigating its lands adjacent or contiguous to defendant's canal upon reasonable demand, reasonable terms, and within the ability of defendant to supply same by the exercise of reasonable diligence,....* (emphasis added)

We therefore conclude and determine under well-established decisional authority that the appellees had a right to seek a declaratory judgment of their statutory law rights, their common law rights, and their rights under the decisional holdings of the appellate courts of Texas. Appellants had a right to seek a complete declaratory judgment pronouncing the landed right as former users of the Devers Canal System and as owners of landed interest where the land touched the canal system or was dependent on same for rice irrigation water. The farmers before us were in many cases fairly long time users of the Devers Canal System for irrigation water and their pleadings are consistent and harmonious with and make efficacious the Texas Water Commission's Final Order on its Docket No. 8388–M.

■ Furthermore, by decisional precedent, under the common law as well as the statutory law applicable here, the persons or entities owning or holding a possessory right or title to land that adjoins any canal or ditch and who shall have secured a right to the use of the said irrigation water shall be furnished with the irrigation water also. The rates shall be reasonable; the prices shall be just. Further, a duty exists which must be exercised by the irrigation company regardless of contract to furnish those

in possession of the land with water that is necessary for the proper irrigation of the crops, and that the irrigation company is liable for damages caused by its failure to so supply.

No unreasonable conditions may be required of the consumers of the water, being the farmers here. There can be no discrimination. Importantly, the courts will enforce these rights and the courts are not in need of any statutory enactment to give them this jurisdiction and this power. *Lastinger v. Toyah Valley Irr. Co.,* 167 S.W. 788 (Tex.Civ.App.—El Paso 1914, no writ). Under basic constitutional provisions the courts of Texas and the district courts of Texas are always open for business and for the legitimate exercise of their duties, powers and prerogatives. TEX. CONST. Art. I, § 13.

The El Paso Court, speaking through Justice McKenzie wrote:

*Independent of the contract,* then, we find that it is the duty of the irrigation company to furnish water to the parties in possession of the land for the irrigation of the crops, failing which, the irrigation company is liable for such damages as were suffered by reason of its failure to perform its obligations to the tenants of the land. *This is made so by the statute, and we are of the opinion that it is so at common law, independent of the statute.* (emphasis added)

The District Court of Liberty County is a court of general jurisdiction, possessing the jurisdiction and power to declare and preserve and enforce the rights of the parties, including the rights of the appellees, both under state law, the common law and the constitutional law of our state. TEX. CONST. art. V, § 8; TEX. GOV'T CODE ANN. §§ 24.-007, 24.008 (Vernon 1988).

Indeed, the Texas Water Commission did not attempt to usurp or exercise any such proper authority that reposed in the Liberty County District Court, nor did the Liberty County District Court encroach upon the statutory duties of the Texas Water Commission. Realistically, the appellees did not file their petition in Liberty County District Court to contest the 1991 water

rates; nor did the appellees ask the District Court to set the water rates. We conclude that the Liberty County District Court was possessed of subject-matter jurisdiction; we overrule appellants' point of error number one.

TEX. CONST. art. V, § 8 reads as follows:

Sec. 8. District Court jurisdiction consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body. *District Court judges shall have the power to issue writs necessary to enforce their jurisdiction.*

The District Court shall have appellate jurisdiction and general supervisory control over the County Commissioners Court, with such exceptions and under such regulations as may be prescribed by law. (emphasis added)

TEX. GOV'T CODE ANN. §§ 24.007, 24.008 state:

### § 24.007. Jurisdiction

The district court has the jurisdiction provided by Article V, Section 8, of the Texas Constitution.

### § 24.008. Other Jurisdiction

The district court may hear and determine any cause that is cognizable by courts of law or equity and may grant any relief that could be granted by either courts of law or equity.

Furthermore, the appellants advance the proposition that the Liberty County District Court made an invasion of the Texas Water Commission's rights, powers and jurisdictions. Looking at the Docket No. 8388–M and comparing the same with the plaintiffs' petition, we cannot agree to this contention. *See Foree v. Crown Central Petroleum Corporation,* 431 S.W.2d 312 (Tex.1968); *Gregg v. Delhi–Taylor Oil Corp.,* 162 Tex. 26, 344 S.W.2d 411 (1961). Briefly stated, these appellees did not bring a legal proceeding in the District Court of Liberty County to either contest or to attempt to set the water rates for 1991, either as they affected the appellants' rights

or their own rights. The water rates question was presented to the Commission.

In this present proceeding, the appellees have petitioned the district court to declare and uphold and to enforce the rights of the farmers as have been described above, which said rights are consistent with the correct legal rate now in effect for the canal system, being the rate set by the Commission in its Docket No. 8388–M. The District Court at Liberty sitting in equity through its trial chancellor, we determine, had jurisdiction of the subject-matter to issue a temporary injunction and to grant partial, temporary relief pending a trial on the total merits of the litigation.

The equity chancellor, having conducted the hearing and observed the demeanor and tenor of the witnesses and after reviewing the evidence, was acting in order to preserve the status quo. That status quo was the last peaceful, undisturbed, quiet, usual status quo of long duration, which existed before an abrupt, material, substantial and even drastic change or changes in the water rates and the contracts now in dispute—that is, the new written contracts—between the farmers and the TWRI were insisted upon by TWRI and Glass.

One of the proudest boasts of Texas jurisprudence that has been recognized for decades is that perfect and harmonious blending of both equity and equitable powers and common law and statutory law, all within the district courts of our state. The chancellor, by his actions through the temporary restraining order and the temporary injunction, was simply and plainly effectuating the long-standing rights, customs, usages, and positions of the farmers on the one hand and the appellants on the other pending a jury trial, if demanded, upon the entire merits of the lawsuit. Also, *see and compare Administrative Procedure and Texas Register Act,* § 19A, TEX.REV.CIV. STAT.ANN. art. 6252–13a (Vernon Supp. 1991). This statute does not deprive the Liberty County District Court of jurisdiction over the subject matter herein. *See and compare Lower Colorado River Au-*

*thority v. Camp Warnecke*, 267 S.W.2d 840 (Tex.Civ.App.—Austin 1954, no writ).

### The Standard of Review

■ With candor, all the appellant-litigants agree that the standard of review in passing upon a trial court's granting of a temporary injunction by an appellate court is whether the trial court abused its discretion. All parties cite *Davis v. Huey*, 571 S.W.2d 859 (Tex.1978).

Justice Sam Johnson, writing for a unanimous Supreme Court in *Davis, supra,* wrote:

## THE TEMPORARY INJUNCTION REVIEW

The Davises contend that the court of civil appeals far exceeded the proper scope of appellate review of a temporary injunction and improperly granted premature review of the entire case on its merits. We must agree. The appeal of an order granting or denying a temporary injunction is an appeal from an interlocutory order, which is expressly authorized by Article 4662, Texas Revised Civil Statutes Annotated. Accordingly, the merits of the underlying case are not presented for appellate review. Appellate review of an order granting or denying a temporary injunction is strictly limited to determination of whether there has been a clear abuse of discretion by the trial court in granting or denying the interlocutory order. [Citations omitted]

The court of civil appeals opinion contains no indication that it confined its appellate consideration to review for abuse of discretion. To the contrary, it appears that the court of civil appeals gave full consideration to the merits of the underlying lawsuit. The opinion itself characterizes the case as an appeal from an order denying an injunction. The opinion makes no reference to the interlocutory nature of the injunction or to the abuse of discretion standard. Further, the order which the court of civil appeals directed the trial court to enter upon remand fully grants the relief sought by the Hueys in their lawsuit:

injunction of the construction until the Davises' plans are approved by the developer.

■ The applicants for a temporary injunction are not under the necessity to establish that they will finally prevail in the litigation; these applicants need only show a probable right and also a probable injury. And, of course, the trial court's order in issuing the writ of temporary injunction will be reversed only upon the showing of a clear abuse of judicial discretion. *Transport Co. of Texas v. Robertson Transports*, 152 Tex. 551, 261 S.W.2d 549 (Tex. 1953); *Omniphone, Inc. v. Southwestern Bell Tel.*, 742 S.W.2d 523 (Tex.App.—Austin 1987, no writ).

The trial court, sitting in equity and chancery blended with the common law and statutory law, is cloaked with broad discretion in determining whether the pleading and the evidence presented to it reveal a case of probable right and probable injury and damage. We conclude that the appellees demonstrated that the appellants were depriving irrigation water to the farmers from the Devers Canal System unless the farmers executed and agreed to the appellants' water supply written contract, which contract eviscerated the Commission's valid, viable Order. Those contracts would have required and mandated the farmers to pay more than the lawful rate for water as set by the Commission. We perceive that the chancellor could have looked upon this as a wrongful act on the part of the appellants inasmuch as there was no agreement, promise, or realistic security proffered by the appellants to refund any overpayments to the farmers if the Commission's Order ultimately obtained finality, validity and enforcement.

The record clearly establishes that these farmers had been in need of water and that they simply could not grow their rice crops without water from the Devers Canal System. The appellees further showed a probable right to receive this water from the canal system under both statutory law and common law. This right existed in favor of the farmers either with or without a writ-

ten water supply contract. *Borden, supra; American Rio Grande, supra.*

Also, the appellees showed imminent harm would result to the rice crop if the same were attempted to be produced without irrigation water and, hence, showed severe, horrendous injuries and damages. These injuries and damages were irreparable because of the fact that the rice crop simply could not be successfully planted, cultivated and harvested without irrigation water. In short, a year's rice crop would be lost to the detriment of the whole community. Under this scenario within the broad discretion of the equity chancellor an order or a writ of temporary injunction could be granted to prevent such continuing harmful and wrongful acts which would in probability, if continued, result in the failure of one year's crop of rice.

Furthermore, the equity court below had broad discretion in determining whether or not the farmers had an adequate remedy at law. *See Brazos R. Conservation & Reclamation Dist. v. Allen,* 141 Tex. 208, 171 S.W.2d 842 (1943). And this adequate remedy at law must be clear, full, realistic and adequate.

We quote from *Brazos R. Conservation & Reclamation Dist., supra,* 171 S.W.2d at 846:

"It is not enough that there is a remedy at law; it must be plain and adequate, or, in other words, as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." *Id.*

Although this opinion was written by Smedley, Commissioner, the same was adopted by the Supreme Court. We conclude that this holding by the Supreme Court in *Brazos R. Conservation, supra,* means that the remedy at law must be as plain, adequate, practical and efficient, just and as prompt as the remedy in equity, being the temporary injunction. Hence, we find no abuse of discretion on this point.

■ Temporary injunctions have as their basic functions the preservation of the status quo, being the last peaceful, usual status quo while pending and awaiting upon a trial on the merits of a cause. *See and*

compare *Irving Bank & Trust Co. v. Second Land Corp.,* 544 S.W.2d 684 (Tex.Civ. App.—Dallas 1976, writ ref'd n.r.e.).

The group of farmers demonstrated that the water rights of which they were being deprived and denied were and are an actual part of their title interest and ownership interest and possessory interest in land being adjacent and contiguous to the canal system. The wrongful acts or actions of the appellants were continuous and at different times, thereby causing many uncertainties and damages involving the planning, the cultivating, and the harvesting of a rice crop. The necessity of a useful and adequate supply of irrigation water on a rice crop is definitely determined by nature. The natural rainfall of the area cannot at all be depended upon and clearly the appellees herein had no practical and really efficient way to measure the damages being caused to their crops. At the very least, the appellees had no adequate remedy at law that was as efficient as the equitable writ of temporary injunction. This is the paramount test.

Significant and important is the part of the record wherein the appellants' own evidence before the trial court tended to admit that the financial condition of TWRI was tenuous. Also, the appellants took the position that they could not continue to financially and successfully operate the canal system at the rate set by the Commission. Appellants maintain that unless they received the entirety of the higher rates that they themselves published for 1991 that the said appellants would not be able to continue to operate the canal system successfully through the 1991 rice growing season. Moreover, bankruptcy was a likelihood.

There exists in the record before us a certain emergency motion for leave to file a petition for writ of injunction filed by the Trinity Water Reserve, Inc., d/b/a Devers Canal System, et al, versus the Texas Water Commission. This is a verified, emergency motion swore to by Honorable Paul M. Glass, before Deborah Shoemaker, a Notary Public in and for the State of Texas. This sworn motion sets out in substance that most of the farmers have now

planted their rice *and will be needing water within a few days.* Because the Texas Water Commission's Order is now in full effect due to the automatic supersedeas, TWRI will be precluded from obtaining any water payments which are above the 1990 water rate and the 1991 rate is insufficient to operate the system in 1991. Furthermore, the sworn motion states in substance that the 1990 water rates are too low for the TWRI to afford to operate the system in 1991. We find this further sworn pleading stating as follows:

> If TWR is bound by the TWC Order, which requires TWR to charge rates at 1990 levels, TWR will be unable to operate, and will probably declare bankruptcy. Should that occur, the Devers Canal System will not operate in 1991....

Hence, under this record and under the sworn pleadings and emergency motions of TWRI, the chancellor within his broad discretion could properly conclude that the rice cultivators had no meaningful, adequate remedy at law. The farmers, in practical effect, probably had no remedy at law under the admission of TWRI.

Additionally, in the record, there appears a *petition for a writ of prohibition filed by the Trinity Water Reserve, Inc., d/b/a Devers Canal System, Relator, versus The Honorable J.C. Zbranek, Judge, 75th Judicial District Court of Liberty County, Texas.* This petition was filed as part of an original proceeding in the Third Court of Appeals sitting at Austin. TWRI sets forth in substance that if TWRI is forced to provide service for only $32.75 when $51.50 is due under its posted rate schedule with no contractual security as to when or if the remaining rate is to be paid or the amount, *then TWRI will be forced into bankruptcy and this appeal will be rendered moot. Further, the pleading advances that if the Devers Canal System is forced to continue without contracts to pledge as security to the bank to obtain interim financing, then the canal system will continue to experience cash shortfalls in 1991 and will be unable to continue operation.* In view of these verified and factual pleadings and writ, we see no abuse of discretion when the trial court concluded that the

appellees had no realistic and fully adequate remedy at law. We overrule point of error number two of the appellants.

■ The appellants' point of error three contends that the trial court erred in granting the temporary injunction because the balance of harms demands that no injunction issue. A major thrust and attack of the appellants' argument under this third point of error is to the effect that if any farmer had merely signed the contract demanded of him, he could have obtained water for his rice crop immediately. Then the argument was made that in contrast thereto, if the injunction was issued as it was, that is, the temporary injunction, then such issuance would create a substantial hardship to and against TWRI; but the thrust and the argument thereunder does not countenance nor does it face the much higher rates for the water that was strictly provided for in the contracts of TWRI which the farmers declined to sign. We perceive the arguments and contentions made by the appellants under their last point are more appropriately termed a balancing of the equities. In this ancient and well-respected doctrine, in equity the chancellor has a very broad discretion. We are not to substitute our judgment at the appellate level for the trial court. We feel constrained and are bound to follow the cases of *McGalliard v. Kuhlmann*, 722 S.W.2d 694 (Tex.1986), and *State v. Arnold*, 778 S.W.2d 68 (Tex.1989).

We perceive that the order or writ of temporary injunction was issued to preserve the last peaceful, usual, accepted, quiet, undisturbed status quo of some lengthy duration. That being the principal function or office of a temporary injunction coupled with the perception and holding on our part that the trial chancellor committed no violation at all of his discretion, and certainly no clear violation of his discretion, we are therefore constrained under well-established rules of law to affirm and uphold the order of temporary injunction.

AFFIRMED.

Footnote 1. The Order of the Texas Water Commission:

## TEXAS WATER COMMISSION

AN ORDER Setting Water Rates in the Matter of the Petition of the Devers Canal Rice Producers Association, Inc., et al., against Boyt Realty Company and Trinity Water Reserve, Inc., dba Devers Canal System, Docket No. 8388–M

On December 12, 1990, the Texas Water Commission (Commission) considered the petition of Devers Canal Rice Producers Association, Inc., Three Dailey Farms, Inc. and J & E Farms, Inc. (collectively, Petitioners) requesting the Commission, pursuant to Sections 11.036–11.041 and 12.013 of the *Texas Water Code*, to review contract terms and prices for water supplied by Trinity Water Reserve, Inc. and Boyt Realty Co. through the Devers Canal System and to set just, reasonable and nondiscriminatory rates and terms for water. The petition was presented to the Commission with a Proposal for Decision by Joseph W. O'Neal, an Administrative Law Judge (ALJ) of the Texas Water Commission, following a public hearing held on July 18 and 31; September 4, 7, 18, 19, 20, 24, 25, 26 and 27, as well as October 1, 2, 3, 8, 9, and 31, 1990.

The ALJ designated the following as parties to the proceeding: Devers Canal Rice Producers Association, Inc.; Three Dailey Farms, Inc.; J & E Farms, Inc.; J.M. Frost, III; Trinity Water Reserve, Inc. dba Devers Canal System; Boyt Realty Co.; the Executive Director of the Commission; and the Public Interest Counsel of the Commission.

After considering the ALJ's Proposal for Decision and the evidence and arguments presented, the Texas Water Commission makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. The Devers Canal System (canal system) is located in Liberty, Chambers and western Jefferson Counties, Texas. It consists of over 70 miles of main canals and 120 miles of laterals. The canal system diverts state water from the Trinity River at pump station No. 1 near Moss Bluff, Texas. Water is lifted further by pump station No. 2 and flows by gravity through the main (lower) canal system. A separate section of the canal (re-lift) system receives water from the main (lower) canal by means of a re-lift pump (pump station No. 3) to serve the higher elevation farms to the north.

2. Under Permit No. 5271, Permit No. 1970, as amended, and a 1959 agreement among the former Devers Canal Company, the city of Houston and the Trinity River Authority of Texas (TRA), the canal system has the right to divert and use a maximum of 86,000 acre-feet of water per annum from the Trinity River and releases from Lake Livingston free of charge.

3. The Devers Canal Rice Producers Association, Inc. (DCRPA) is a nonprofit Texas corporation consisting of eighty members who are farmers and landowners that purchase water from the canal system for rice irrigation within the canal system service area. Three Dailey Farms, Inc.; J & E Farms, Inc.; and J.M. Frost, III are members of DCRPA.

4. Trinity Water Reserve, Inc. (Trinity Water Reserve) is a Texas corporation that, under a January 15, 1990 lease/purchase option contract, was the lessee and operator of the canal system in 1990. Trinity Water Reserve has not yet exercised its option to purchase the canal system pursuant to the lease/purchase option contract.

5. Boyt Realty Co. is a Texas corporation and the current owner of the canal system that contracted with Trinity Water Reserve for a lease and option to purchase the canal system.

6. On February 1, 1990, Trinity Water Reserve set rates for water supplied by the canal system for irrigation purposes.

7. On February 20, 1990, Petitioners filed a petition with the Commission requesting the Commission, pursuant to Sections 11.036–11.041 and 12.013 of the *Texas Water Code*, to review contract terms and prices for water supplied by Trinity Water Reserve and Boyt Realty Co. through the canal system and to set just,

reasonable and nondiscriminatory rates and terms for water.

8. In a memorandum dated March 5, 1990, the Executive Director of the Commission determined that probable grounds for the petition exist and assigned Docket No. 8388–M to the petition.

9. During its meeting on March 21, 1990, the Commission considered the petition, set a preliminary hearing, and referred the petition to the Office of Hearings Examiners for a hearing to be held on April 26, 1990. These actions are reflected in an April 4, 1990 Order of the Commission.

10. Proper notice of the public hearing was mailed by the Chief Clerk of the Commission to the petitioner and respondents and other interested persons pursuant to Section 13(a) of the *Administrative Procedure and Texas Register Act,* Tex.Rev.Civ.Stat.Ann. art. 6252–13a (Vernon Supp.1990).

11. During its meetings on April 4 and 11, 1990, the Commission set interim rates for water from the canal system to Petitioners and members of DCRPA. A Commission interlocutory Order setting interim rates was signed on April 11, 1990. The Order set interim rates at $90 per acre for water contracted and received from the main canal and $95 per acre for water contracted and received from the re-lift section of the canal system and established a payment schedule for the year 1990.

12. Boyt Realty Co. was formed in 1955 by E.W. Boyt, E.V. Boyt, C.K. Boyt, C.B. Jeffrey (husband of Leila Boyt Jeffrey) and G.W. Maxwell (husband of Ila Boyt Maxwell), all of whom also directed and operated the company. Since 1955, Boyt Realty Co. has been owned and operated by members of the Boyt family primarily as a real estate company, with headquarters in Devers, Texas.

13. The cash basis methodology is appropriate for determining the test-year revenue of the canal system.

   a. The parties utilized the cash basis methodology in this case.

   b. The cash basis methodology will produce a rate sufficient to recover necessary and reasonable costs and avoid over-recovery of costs.

14. The parties utilized calendar year 1990 as the test year for determining the revenue requirements of the canal system.

15. Prior to December 1, 1969, the canal system was operated by the Devers Canal Company, which was owned by E.W. Boyt and his four children, E.V. Boyt, C.K. Boyt, Ila Boyt Maxwell and Leila Boyt Jeffrey.

16. Prior to December 1, 1969, the Devers Canal Company operated the canal system. There was no long-term debt secured by canal system revenues prior to December 1, 1969.

17. Between 1926 and 1950, all of the major facilities of the canal system, including its main pumps and motors, pump houses, main canals, major laterals and buildings were placed in service. The major facilities in service today are either the identical facilities put into service prior to 1950 or facilities that were fully paid for out of revenues of the canal system.

18. In December, 1969, E.V. Boyt, C.K. Boyt, Ila Boyt Maxwell and Leila Boyt Jeffrey sold the Devers Canal Company and the canal system to TRA for $5,000,-000, consisting of $4,500,000 in TRA–Devers Canal System Revenue Bonds ("1969 revenue bonds") and $500,000 in cash assets of the canal system. The revenue bonds were 40–year bonds, maturing in the year 2009, with an interest rate of four percent per annum. The bonds do not require periodic retirement of portions of the principal of the bonds during the 40–year period.

19. TRA issued $4,500,000 in 1969 revenue bonds equally to E.V. Boyt, C.K. Boyt, Ila Boyt Maxwell and Leila Boyt Jeffrey.

20. TRA owned and operated the canal system from December, 1969 to December 1, 1986. During its operation of the canal system, TRA repaid approximately $510,000 of the principal of the 1969 revenue bonds, leaving an outstanding principal amount of $3,990,000 for the 1969

revenue bonds. This amount remains outstanding today.

21. The owners of the 1969 revenue bonds since at least 1986, and the respective portions of ownership of the bonds are: Sue B. Boyt, ¼th; Ila Boyt Maxwell, ¼th; Leila Boyt Jeffrey, ¼th; Kathleen Boyt, ⅛th; Patrick E. Boyt, 1/16th; Jefferson E. Boyt and Mark C. Boyt (two sons of Patrick E. Boyt), each 1/32nd.

22. During the 17 years TRA owned and operated the canal system, irrigated acreage generally declined from 28,706 acres in 1973 to 8,894 acres in 1986.

23. Shortly before August 27, 1986, the general manager of TRA met with the owners of the 1969 revenue bonds to advise them of the poor financial condition of the canal system, the poor financial outlook for the future, and the inability of TRA to pay any principal or interest on the 1969 revenue bonds in 1986.

24. In order to avoid a default in 1986 by TRA in the payment of interest on the 1969 revenue bonds and the resulting implications of a default to the bondholders and TRA, the bondholders decided to repurchase the canal system from TRA prior to December 1, 1986, the date on which the 1986 interest payment on the 1969 revenue bonds was due.

   a. In 1986, the owners of the 1969 revenue bonds could not repurchase the canal system by exchanging their 1969 revenue bonds for the system without creating a taxable event for them and losing the tax-free status for the interest on the 1969 revenue bonds.

   b. TRA advertised for bids on the canal system in early October, 1986.

   c. Boyt Realty Co. was the solo bidder for the canal system. As its bid for the purchase price of the canal system, it bid the outstanding amount of the 1969 revenue bonds in order to protect the interests of the Boyt family members who own the 1969 revenue bonds and to keep the canal system in operation to provide irrigation to the land in the Devers Canal system permit area owned by Boyt Realty Co.

25. Boyt Realty Co. purchased the canal system in 1986 by giving a promissory note to TRA for $1,995,000 to mature on December 1, 2009, which is the same day on which the 1969 revenue bonds mature.

   a. The principal amount of the 1986 note is one-half of the principal amount of the outstanding 1969 revenue bonds ($3,990,000) on December 1, 1986.

   b. The interest payable on the 1986 note, at a total rate of 12.3478261 percent, is divided so that eight percent interest, exactly double the interest payable on the 1969 revenue bonds (four percent), is payable annually on December 1, to correspond in amount ($159,600) and timing to the annual interest payment on the 1969 revenue bonds. Payment of the remaining interest at the 4.3478261 percent rate under the note is deferred until December 1, 2009, which is the same date upon which the principal of the 1986 note and the principal of the 1969 revenue bonds are due, and the deferred interest constitutes another $1,995,000 which is equivalent to the second half of the principal amount of the 1969 revenue bonds.

26. Boyt Realty Co. operated the canal system during the years 1987 through 1989.

   a. Boyt Realty Co. charged $90 per acre on the main canal and $95 per acre on the re-life canal in 1989.

   b. Boyt Realty Company made its greatest profit from its operation of the canal system in 1988 when water rates were $85 per acre on all sections of the canal system and first crop acreage exceeded 16,000 acres.

27. On January 15, 1990, Boyt Realty Co. entered into a lease/purchase option agreement with Trinity Water Reserve under which Trinity Water Reserve would lease and operate the canal system until December 1, 1990 and have an option to purchase the canal system until November 15, 1990.

   a. Boyt Realty Co. sought to sell the canal system in 1989 because bank financing of the annual operation loan for the canal system became more and

more difficult to obtain due to the precarious condition of the real estate division of Boyt Realty Co., the first lien of the bondholders on canal system revenues, and the desire of the bank for additional collateral in the form of personal guarantees and subordination of the first lien of the family bondholders.

b. The owners of the 1969 revenue bonds did not want to subordinate their first lien on the canal system revenues and assets.

c. In 1989, the consensus of the Boyt family owners of the 1969 revenue bonds and the directors of Boyt Realty Co. was to sell the canal system.

28. Principal and interest on the December 31, 1989 note for $160,000 to Kathleen Boyt by Boyt Realty Co. cannot be included in the test year cost of service of the canal system.

a. The note reflects a part of a $200,000 loan that Kathleen Boyt made to Boyt Realty Co. in March, 1988 to assist in repaying a 1987 operating loan of Boyt Realty Co. so that Boyt Realty Co. could obtain a 1988 operating loan for the canal system.

b. Inclusion of principal and/or interest payments on the 1988 debt owed to Kathleen Boyt in the 1990 cost of service of the canal system would constitute prohibited retroactive ratemaking and would discriminate against current and future ratepayers because it would utilize a current or future rate to recover a past expense or debt that should have been paid in 1989.

c. The 1988 transaction between Kathleen Boyt and Boyt Realty Co. was an affiliated transaction because Kathleen Boyt is an affiliate of Boyt Realty Co., which was the owner and operator of the canal system in 1988 and 1989. Kathleen Boyt owns 12.5 percent of the 1969 revenue bonds and thus is a person in a chain of successive ownership of five percent or more of the voting securities of the canal system of Boyt Realty Co.

d. It is inappropriate to include principal and interest on the note since the canal system was leased to Trinity Water Reserve, Inc.

29. The principal and interest accruing since December 1, 1986, on the $1,995,000 note by Boyt Realty Co., issued to TRA in 1986, cannot be included in the canal system cost of service because it is inappropriate to include these past, deferred costs in the cost of service for the test year used in the determination of appropriate rates and would discriminate against current and future canal system ratepayers.

30. The portion of the principal of the $1,995,000 note by Boyt Realty Co. issued to TRA in 1986, that represents the unpaid principal of the 1969 revenue bonds amortized for the period 1970–1986 cannot be included in the canal system cost of service because it is inappropriate to include these past, deferred costs in the cost of service for the test year used in the determination of appropriate rates and would discriminate against current and future canal system ratepayers.

31. The entire amount of principal and interest under the $1,995,000 note to TRA that represents the $3,990,000 outstanding principal and interest of the 1969 revenue bonds cannot be included in the canal system cost of service for determining current and future rates.

a. The 1986 sale of the canal system was an affiliated transaction among TRA, the owners of the 1969 revenue bonds and Boyt Realty Co., the terms of which were not justified as necessary or reasonable.

(1) The owners of the 1969 revenue bonds were affiliates of TRA in 1986 because they were persons who indirectly held more than five percent of the voting securities of the canal system, who were in a chain of successive ownership of five percent or more of the voting securities of the canal system, who directly and indirectly exercised substantial influence and control over the actions of TRA in connection with the 1986 sale of the canal system, and who exercised

substantial influence over the 1986 sale of the canal system by TRA in conjunction with TRA and Boyt Realty Co.

(2) The owners of the 1969 revenue bonds were affiliates of Boyt Realty Co. at the time of the 1986 sale of the canal system because: Patrick E. Boyt owned 1/16th of the bonds and owned 1/3rd of the shares of Boyt Realty Co.; Sue B. Boyt owned 1/4th of the bonds and 1/3rd of Boyt Realty Co.; the other bondholders—Kathleen Boyt, Ila Boyt Maxwell, Leila Boyt Jeffrey, J.E. Boyt and M.C. Boyt—were all related to Pat Boyt by blood relationship; and TRA, the bondholders and Boyt Realty Co. acted in concert in transacting the 1986 sale in order to protect the financial interests of the bondholders and financial status of TRA.

(b) The portion of the 1969 purchase price TRA paid for the canal system over and above its net book value was a cost of acquisition to TRA that was not justified for inclusion in the cost of service.

(1) The net book value of the canal system prior to the 1969 sale of the canal system was zero.

(2) The major assets of the canal system were placed into utility service between 1926 and 1950 and continue in use today.

(3) Improvements to the canal system over the last twenty years or more were paid for out of existing revenues at that time and not capitalized.

(4) The Devers Canal Company regularly took annual depreciation expenses on the canal system assets prior to December 1, 1969 and thereby fully recovered its investment in the canal system assets.

(5) The depreciable life of the main pumps, motors and pump houses of the canal system was twenty years.

(6) Inclusion of any past depreciation expense that should have been taken in prior years into the cost of service

for the test year of the canal system would be inappropriate.

32. It is not appropriate to include raw water cost in the cost of service, since the canal system has never had to pay for raw water.

33. It is proper to include the lease payment of $160,000, payable by Trinity Water Reserve for the lease of the canal system for 1990, in the cost of service, since it is a reasonable amount based on the total revenue requirement and it is a known and measurable cost of service item.

34. It is not appropriate to include the $52,000 salary plus related costs for a president's position in the cost of service.

a. A salary for a president or other similar officer was not included in the expenses of the canal system in prior years when the canal was operated by Boyt Realty Co.

b. The general manager of the system is well qualified to operate the system, both by education and experience with the canal system.

35. It is inappropriate to include the requested pay raises of $15,253.99 for the canal system employees in the cost of service, since the pay raises were not put into effect, and do not meet the test of a known and measurable change.

36. It is appropriate to include a $60,000 management fee in the cost of service.

a. The management fee is needed to provide an economic initiative to operate the canal system.

b. An examination of the aggregate of the lease expense and management fees show that these fees are reasonable. The following data is valid for an analysis:

| Description | Source | Amount |
|---|---|---|
| Depreciation expense | Stowe:Ex.JES–1 | $111,000 |
| Net assets | | $926,000 |
| Working cash allowance | O & M × .125 | $145,000 |
| Rate of return | Moody's | 10.0% |

If the cost of service were to be calculated using the utility basis methodology, the utility might expect a positive cash flow (without debt service considerations) of approximately $218,-000 (depreciation expense at $111,000

plus return at $107,000). The aggregate of lease expense and management fee, in the amount of $220,000, compares favorably with the positive cash flow of $218,000, if the utility methodology were utilized. Consequently, the aggregate of the lease expense and the management fee is within a reasonable range.

37. It is appropriate to include the $40,000 cost to repair Adolph's Flume damaged in the Trinity River Flood of 1990, in the cost of service for the year 1990, but this expense should be recovered through a surcharge which is effective for 1990 only.

   a. Adolph's Flume is a 524-foot-long structure, similar to a bridge, with a wooden channel to transport the water across Adolph's Bayou in the Trinity River bottom area.

   b. The flood caused the flume to float, pulling much of the structure apart.

   c. The flume was lined with a plastic membrane for a temporary repair to allow use of the flume for the 1990 rice growing season.

   d. The flume must be repaired before the next rice growing season.

   e. Repair of the flume will require cranes to be placed in the river bottom to lift the flume channel at several points.

   f. The cost of materials, equipment and labor will be at least $40,000.

38. It is appropriate to allow Respondents (Trinity Water Reserve, Inc.) a rate case expense of $45,000, for the year 1990, but this expense should be recovered through a surcharge which is effective for 1990 only.

   a. Based on the size and complexity of this case, the $150,000 requested by respondents is excessive.

   b. Rate case expenses can be considered as a cost of doing business for a water supplier.

   c. It is appropriate that reasonable rate case expenses of respondent be calculated as follows:

| Rate Consultant | | |
|---|---|---|
| Prefiled testimony and exhibits | $15,000 | |
| Hearing | 5,000 | |
| | | $20,000 |
| Attorney | | |
| Preparation, (Discovery, etc.) | $15,000 | |
| Hearing | 8,000 | |
| Post-hearing | 2,000 | |
| | | $25,000 |
| Total Rate Case Expense | | $45,000 |

---

39. It is not appropriate to include rate case expenses for Petitioners in the cost of service since the rate case expenses for the Petitioners are not an actual cost of service.

40. It is not appropriate to increase the test year electrical power cost from the $273,270 amount originally requested by the Respondents.

   a. Because power costs fluctuate from year to year, rate experts recognize the necessity of "normalizing" the historical power costs in order to arrive at a representative test year amount.

   b. Last minute changes cannot be reasonably examined by the Commission or parties to determine whether such costs are necessary, reasonable, actually incurred and representative ("normalized") of ordinary test year expenses.

41. It is reasonable and just to include $34,370 for overtime salaries in the cost of service.

a. The amount of $35,237 requested by Respondents is reduced by the $867 adjustment for a proposed pay raise, which leaves a balance of $34,370.

b. An amount of $34,370 for overtime salaries is reasonable considering the full time nature of the canal business during rice growing season.

42. The Devers Canal System is not entitled to recover acquisition costs associated with the lease purchase option since acquisition costs are inappropriate as a cost of service component under the cash basis methodology.

43. It is not appropriate to include payments on the three pickup trucks in the cost of service.

a. Trinity Water Reserve purchased the pickups for the canal system while it was leasing the canal system.

b. It is not reasonable and just to allow this expense because of the uncertainty about the disposition of the trucks if Trinity Water Reserve does not exercise its option to purchase the system.

44. It is not appropriate to include the cost of a trackhoe purchased by Trinity Water Reserve in the cost of service.

a. Trinity Water Reserve was leasing the canal system when it purchased the trackhoe.

b. The buyer did not perform any assessment of whether the canal system could afford another trackhoe or whether purchasing another trackhoe would be a prudent investment for the canal system.

c. It is not reasonable and just to allow any payments for the trackhoe because of the uncertainty of the disposition of the trackhoe if Trinity Water Reserve does not exercise its option to purchase the system.

45. It is appropriate to include $16,000 in the cost of service for professional services (auditing, legal, and engineering fees).

a. The actual amount for the test year was $20,756.68 for audit, legal, and engineering expenses.

b. The Respondents have adjusted the actual amount downward by $4,756.60, by estimating reasonable audit expenses to be $10,000, reasonable legal expenses to be $5,000, and reasonable engineering expenses to be $1,000, for a total of $16,000.

c. A total cost of $16,000 for professional fees is a just and reasonable amount for this canal system.

46. It is reasonable and just that the transcript costs ($7,415) be shared equally by the Petitioners and Respondents.

a. Brevity was not demonstrated by one side any more than the other in their presentations and thus equal responsibility should be shouldered for the length of the transcript and its costs.

b. Attorneys for the Petitioners and Respondents knew or should have known that this case could become quite expensive.

c. One-half of the transcript cost is $3,707.50.

47. The canal system contracted for the supply of water for irrigation purposes to a total of 13,350 acres of cropland during the test year, with 11,410 acres thereof receiving water from the main canal and 1,940 acres of cropland receiving water from the re-lift canal.

48. The just and reasonable revenue requirements for the canal system are $1,165,989 for the test year (1990) and $1,080,989 for the year 1991, computed as set out in Tables 1 and 2 attached and incorporated into this Order.

49. The appropriate rate differential between the rate for water delivered from the main canal and the rate for water delivered from the re-lift canal, is $5.00 per acre in accordance with historical practice.

50. The just, reasonable, and nondiscriminatory rates for water from the canal system are $79.37 per acre for irrigation water delivered from the main canal and $84.37 per acre for irrigation water delivered from the re-lift canal.

a. The cost of serving the main canal system and the re-lift canal system is calculated to be $1,080,989.

b. It is appropriate to allocate 1.12 percent of the above cost, comprising $11,-

755, to Moss Bluff Gas Storage Company. As set out in Table 3, this leaves $1,069,234 to be apportioned to irrigators.

c. Apportioning $1,069,234 according to the formula set out in Table 3 results in a cost per acre on the main canal of $79.37.

d. Adding $5.00 for the re-lift canal results in a cost per acre on the re-lift canal of $84.37 per acre.

51. It is reasonable and just to require that the rates set in this proceeding take effect on February 20, 1990, which is the date on which the petition in this case was filed with the Commission.

52. It is reasonable and just to allow Trinity Water Reserve to recover the cost of the repair to Adolph's flume of $40,000 and the reasonable rate case expenses of $45,000, through a surcharge which is effective for 1990 only, of $6.29 per acre for irrigation water delivered from the main canal and the re-lift canal, as calculated in Table 3.

53. It is reasonable and just that the Respondent Trinity Water Reserve, Inc. refund the difference between the final rate set by this Order and the interim rate, without interest, to the extent that the customer actually paid the interim rate.

## CONCLUSIONS OF LAW

1. The public hearing was held under the authority of Sections 11.036–11.041 and 12.013 of the *Texas Water Code*.

2. Sections 11.036–11.041 of the *Texas Water Code* grant water users and customers, as well as holders of water rights, certain protective rights. The Commission has authority to conduct a hearing on a petition for review of rates and to set just, reasonable, and nondiscriminatory rates.

3. The Commission has jurisdiction under Section 11.041 and 12.013(f) to order refunds or additional payment.

4. The Commission has jurisdiction under Section 12.013(e) to establish interim rates and compel continuing service during the pendency of any rate proceeding

under Chapter 11 of the *Texas Water Code*.

5. The rates of Trinity Water Reserve for the year 1990 are not reasonable or just.

6. The rates set forth in Finding of Fact No. 50 are just, reasonable and nondiscriminatory in accordance with Sections 11.036–11.041 of the *Texas Water Code*.

7. The surcharge set forth in Finding of Fact No. 52 is just, reasonable and nondiscriminatory in accordance with Sections 11.036–11.041 of the *Texas Water Code*.

8. The owners and/or lessee (if applicable) of the canal system are obligated under Sections 11.036–11.041 of the *Texas Water Code* to provide continuing service under terms and conditions that are just, reasonable and nondiscriminatory to members of the DCRPA and other customer farmers who meet the qualifications of Section 11.038 of the *Texas Water Code*. NOW, THEREFORE, BE IT ORDERED BY THE TEXAS WATER COMMISSION THAT:

1. The petition of Devers Canal Rice Producers Association, Inc., Three Dailey Farms, Inc. and J & E Farms, Inc. is hereby granted to the extent set forth in this Order.

2. The exceptions filed on November 30, 1990 by Trinity Water Reserve, Inc. be overruled.

3. The exceptions filed on November 30, 1990 by Boyt Realty Co. be overruled.

4. The exceptions filed on November 30, 1990 by J.M. Frost, III be overruled, except that No. VI concerning the rate differential is sustained, and the parts of No. VII concerning Adolph's Flume repair and rate case expenses for 1991 are sustained.

5. The exceptions filed on November 30, 1990 by Devers Canal Rice Producers Association, Inc., J & E Farms, Inc. and Three Dailey Farms, Inc. be overruled except those parts of No. II concerning the cost of repair of Adolph's Flume and respondent's rate case expenses for 1991 are sustained, and No. III, concerning the price differential of $5.00 is sustained.

6. Trinity Water Reserve and Boyt Realty Co. shall charge and the customer farmers shall pay for water supplied by the Devers Canal System as follows:
   a. $79.37 per acre for irrigation water delivered from the main canal, and
   b. $84.37 per acre for irrigation water delivered from the re-lift canal.
7. The effective date of these rates shall be February 20, 1990 and these rates shall continue in effect unless and until the parties agree upon different rates or the Commission sets other rates in a future proceeding.
8. Trinity Water Reserve and Boyt Realty Co. may charge and the customer farmers shall pay a surcharge effective for 1990 only, of $6.29 per acre for irrigation water delivered from the main canal and the re-lift canal.
9. The amount overpaid or underpaid by each customer for 1990 shall be determined in accordance with the final rates for 1990 set by this Order. If the interim rates as set by the Commission were paid by the customer, no interest will be due on the amount overpaid or underpaid. Refunds or payments shall be made within thirty days of the date this Order becomes final.
10. The owners and/or lessee (if applicable) of the canal system shall supply water through the Devers Canal System on a continuing basis to customer irrigators.
11. Within 20 days of the date this Order becomes final, the owners of the canal system shall provide notice in writing to the customers of the system as to whether the canal system will be providing irrigation water for the upcoming year.
12. After verification by Respondents that the transcript costs have been paid in full, the Petitioners shall reimburse the Respondents for one-half the cost, which is $3,707.50, within 30 days of the date this Order becomes final.
13. Trinity Water Reserve, Inc. shall promptly complete repairs to Adolph's flume. The repairs shall be completed prior to the commencement of the 1991 rice growing season.

14. The Chief Clerk of the Texas Water Commission shall forward a copy of this Order to all parties.
15. If any provision, sentence, clause, or phrase of this Order is for any reason held to be invalid, the invalidity of any portion shall not affect the validity of the remaining portions of the Order.

Issue Date: December 12, 1990.

TEXAS WATER COMMISSION

/s/ B.J. Wynne, III
B.J. Wynne, III,
Chairman

ATTEST:

/s/ Gloria A. Vasquez

for Brenda W. Foster, Chief Clerk