**Motion for Reconsideration En Banc Granted; Opinion and Judgment of December 27, 2018, Withdrawn; Affirmed; and Opinion on Reconsideration En Banc, Concurring Opinion on Reconsideration En Banc, and Dissenting Opinion on Reconsideration En Banc filed August 13, 2019.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-17-00982-CV

---

### CHENIERE ENERGY, INC. AND CHENIERE LNG TERMINALS, LLC, Appellants

### V.

### PARALLAX ENTERPRISES LLC, PARALLAX ENERGY LLC, PARALLAX ENTERPRISES (NOLA) LLC, LIVE OAK LNG LLC, LIVE OAK LNG PIPELINE LLC, MOSS LAKE LNG LLC AND CALCASIEU LNG LLC, Appellees

---

### On Appeal from the 61st District Court
### Harris County, Texas
### Trial Court Cause No. 2017-49685

---

### DISSENTING OPINION ON RECONSIDERATION EN BANC

The trial court abused its discretion in issuing the injunction and in determining that appellees Parallax Enterprises LLC and Live Oak LNG LLC

established two prerequisites for the extraordinary remedy of a temporary injunction: (1) a probability of success on the merits of a claim that could support the injunctive relief sought and (2) imminent, irreparable injury in the absence of immediate injunctive relief.

## I. BACKGROUND

Appellees Parallax Enterprises LLC and several related entities, Parallax Energy LLC, Parallax Enterprises (NOLA) LLC, Live Oak LNG LLC, Live Oak LNG Pipeline LLC, Moss Lake LNG LLC and Calcasieu LNG LLC (collectively, the "Parallax Parties") allege that they reached an agreement with appellants Cheniere Energy, Inc. and Cheniere LNG Terminals, LLC (collectively, "the Cheniere Parties") on all material terms for an "expanded joint development agreement, business association, and venture" to develop jointly two mid-scale liquefied natural gas (LNG) facilities in Louisiana. The proposed venture changed over time. According to the Parallax Parties, the two sides agreed Parallax Enterprises would take the front-line role in developing the facilities and the Cheniere Parties would supply funding of up to $120 million to develop the projects. The Parallax Parties allege the parties originally proposed to own the projects on a 50/50 basis, but later proposed that the Cheniere Parties would pay contractors directly to build the facilities and pay success fees to the Parallax Parties upon completion. The Parallax Parties allege that while the parties were working on the written terms of a final agreement, the Parallax Parties began incurring expenses to develop the project. The Parallax Parties hired Bechtel Corporation to begin engineering and constructing the facilities.

### *The Note and Guaranties*

Cheniere LNG Terminals, LLC advanced about $46 million in development

2

funds. To get the funds, Parallax Enterprises signed a secured promissory note, which the parties amended several times (the "Note"). Several of the Parallax Parties guaranteed the Note. Among the guarantors was Live Oak, a wholly-owned subsidiary of Parallax Enterprises.

The Parallax Parties contend they signed the Note only to satisfy the Cheniere Parties' internal accounting department, and that the parties intended the Cheniere-supplied funds to be considered a capital contribution—or equity—in the joint project rather than a loan that had to be repaid. The Note and security documents do not reflect any of that. The documents show the transaction to be a secured loan. According to the loan documents, the Parallax Parties secured their obligations with collateral and promised to pay back the borrowed sums.

Though the Parallax Parties allege they entered into a partnership agreement with Cheniere to pursue the liquefaction projects, the record contains documents in which the parties expressly disavowed the existence of any such agreement. The Cheniere Parties maintain the parties never reached a final agreement on the joint development of the projects and that Cheniere advanced the funds only as a short-term loan under the express terms of the Note. At the time the Note and Guaranties were signed, the Parallax Parties were not capitalized and had no assets or means to repay a loan.

Before the parties finalized the written terms of their agreement, the deal fell through. Cheniere LNG Terminals, LLC demanded repayment of the $46 million due under the Note. The Parallax Parties failed and refused to pay.

### The Parallax Parties' Allegations Regarding the Note and Guaranties

The Parallax Parties take the position that the $46 million advanced under the Note was not debt but a capital contribution and that the Cheniere Parties were

due to advance even more under an unwritten agreement. According to the Parallax Parties, although the parties had not finalized a written agreement, the Parallax Parties proceeded to develop the project and incurred expenses—including the Note—based on the Cheniere Parties' assurances that the advanced funds would be considered equity and not debt. Live Oak alleged that it incurred substantial liabilities to third parties, and does not have any assets to pay the debts. The Parallax Parties ceased development of the two projects and allege they owe $10 million in debt to third parties.

### *The Parallax Parties' Lawsuit*

The Parallax Parties—including Live Oak—sued the Cheniere Parties, asserting claims for breach of contract, breach of fiduciary duties, promissory estoppel, and quantum meruit. The Parallax Parties also asserted that the Cheniere Parties fraudulently induced them to sign the Note, under which Parallax Enterprises, LLC got about $46 million. The Parallax Parties sought declaratory relief that the Note constitutes equity rather than debt and that the Parallax Parties hold no enforceable security interest.

### *The Cheniere Parties' Counterclaim and Third-Party Claims*

The Cheniere Parties filed a counterclaim against Parallex Enterprises, asserting the right to repayment of the $46 million advanced under the Note. The Cheniere Parties brought third-party claims against four individual defendants and four entities affiliated with those defendants. In addition, Cheniere LNG Terminals, LLC served notice that it intended to effect non-judicial foreclosure of all of Parallax Enterprises' equity interest in Live Oak. The Cheniere Parties contend that Parallax Enterprises' interest in Live Oak serves as collateral for the Note.

4

*Injunctive Relief*

The Parallax Parties sought injunctive relief to prevent Cheniere from: (1) foreclosing on Parallax Enterprises' interest in Live Oak; (2) interfering with or attempting to control the management, governance and/or operation of any of the Parallax Parties; and (3) otherwise disrupting the normal course of business of any of the Parallax Parties. The Parallax Parties also asserted that their rights under the Note are the subject of the lawsuit and that allowing Cheniere LNG Terminals, LLC to foreclose would undermine the trial court's jurisdiction because it would allow the Cheniere Parties a "self-help remedy" without proving any of their claims. The Parallax Parties maintained that the Note was not valid or enforceable, and that Cheniere LNG Terminals, LLC did not have an enforceable security interest in Parallax Enterprises' equity interest in Live Oak.

The Parallax Parties argued they would suffer imminent, irreparable injury absent injunctive relief. They claimed monetary relief would not adequately remedy the interruption of Live Oak's operations, the loss of Parallax Enterprises' management and control of Live Oak, and loss of the court's jurisdiction to determine the claims brought.

After an evidentiary hearing, the trial court granted the requested injunctive relief, finding that absent injunctive relief, the Parallax Parties would "suffer imminent irreparable injury by . . . losing ownership and control over assets, including the limited liability company interest of Live Oak LNG LLC, the rights to which are the subject of the parties' claims in this action, and through which claims are made by [the Parallax Parties] against [the Cheniere Parties]." The trial court also found that without injunctive relief, the Parallax Parties would "be forced to defend their right to control claims made against [the Cheniere Parties], including defending against attempted dismissal of legal claims that [the Parallax

Parties] make against [the Cheniere Parties] and with regard to claims that [the Cheniere Parties] state they intend to assert through ownership of the limited liability company interest in Live Oak LNG, LLC." Under the terms of the injunction order, the Parallax Parties posted a cash deposit in lieu of bond.

## II. REASONS TO REVERSE THE TEMPORARY INJUNCTION

The law permits a court to grant a temporary injunction to preserve the status quo of the litigation's subject matter pending a trial on the merits.[1] Because the law views a temporary injunction as an extraordinary remedy, an applicant is not entitled to one as a matter of right.[2] To get a temporary injunction under equitable principles, the applicant must plead and prove (1) a claim against the defendant, (2) a probable right to the relief sought, and (3) a probable, imminent, and irreparable injury in the interim.[3] These equitable elements of injunctive relief likewise apply to a request for injunctive relief under section 65.011 of the Texas Civil Practice and Remedies Code.[4]

The trial court abused its discretion in determining that the Parallax Parties met their burden of proving a probable right to relief and imminent, irreparable harm. In the absence of these showings — or either of them — the trial court abused its discretion in issuing injunctive relief under general principles of equity and under section 65.011 of the Texas Civil Practice and Remedies Code.

---

[1] *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).

[2] *Id.*

[3] *Id.*; *Hsin-Chi-Su v. Vantage Drilling Co.*, 474 S.W.3d 284, 295 (Tex. App.—Houston [14th Dist.] 2015, pet. denied).

[4] *See* Tex. Civ. Prac. & Rem. Code § 65.001 ("The principles governing courts of equity govern injunction proceedings if not in conflict with this chapter or other law."); *Town of Palm Valley v. Johnson*, 87 S.W.3d 110, 111 (Tex. 2001) (per curiam) (applying irreparable harm element to application under Section 65.011(1)); *City of El Paso v. Caples Land Co.,* LLC, 408 S.W.3d 26, 37 (Tex. App.—El Paso 2013, pet. denied) (stating applicant must establish both probable right to relief and irreparable injury in addition to showing required by section 65.011(2)).

Therefore, this court can and should reverse on one of these bases without reaching the Cheniere Parties' other issues.[5]

## No Showing of Probable Right to Relief

The majority concludes the Note's collateral description fails to create a security interest in Live Oak's equity. The Uniform Commercial Code ("UCC") reflects a "broad policy of leniency for collateral descriptions."[6] Under the UCC, a description of personal or real property suffices, "whether or not it is specific, if it reasonably identifies what is described."[7] "[A] description of collateral reasonably identifies the collateral if it identifies the collateral by . . . category . . . [or] a type of collateral defined in [the UCC]."[8]

The UCC identifies "general intangibles" as a collateral category,[9] defined as "any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction."[10] The majority undertakes to draw a legal distinction between "general intangibles" and "intangible property." Though the majority acknowledges that Live Oak's equity is a general intangible under the UCC, the majority reasons that "intangible property" is too general a description of Live Oak's equity to satisfy the UCC's sufficiency standard.

The description of collateral, though broad, is sufficiently specific. Courts

---

[5] *See* Tex. R. App. P. 47.1

[6] *In re Grogan*, 2013 WL 5630627, at *9 (B.A.P. 9th Cir. Oct. 15, 2013).

[7] Tex. Bus. & Comm. Code § 9.108(a).

[8] *Id.* § 9.108(b).

[9] *Id.* § 9.102(a)(42).

[10] Tex. Bus. & Com. Code Ann. § 9.102(a)(42).

uphold broad descriptions of collateral.[11]  Rather than view the description through the UCC's lens of leniency, as the UCC commands, the majority assesses it with a less-forgiving eye and concludes that the description falls short.  When read in proper context, using the proper standard, the description reasonably identifies what it describes.  So, it suffices.

In assessing the adequacy of the collateral description, the court should begin with the text of the agreement.  Yet, the majority does not cite or discuss the Note's key provision. Section 6.5(a) of the Note expressly creates a security interest in Parallax Enterprises's "general intangibles":

> Each Loan Party hereby assigns, grants and pledges to Payee a first priority security interest in and Lien on all of such Loan Party's right, title and interest in, to and under the assets and properties described on Exhibit A hereof (the "Property"), including all accessions to, substitutions for and replacements, proceeds and products of the foregoing, together with all materials and records related thereto and any **general intangibles** at any time evidencing or **relating to any of the foregoing**.[12]

Exhibit A of the Note states:

Description of the Property

All of Loan Party's right, title and interest in and to the following, whether now owned or hereafter acquired by such Loan Party and whether now existing or in the future coming into existence:

1. All deposit, securities and other accounts and investment property
2. All instruments, documents and chattel paper
3. All inventory, equipment, fixtures and goods
4. All contracts and permits

---

[11] James J. White & Robert S. Summers, *Uniform Commercial Code* 910 (2d. 1980) ("The overwhelming majority of courts uphold very broad descriptions [of collateral under UCC section 9.203]").

[12] (emphasis added).

5. All letter-of-credit rights
6. All intellectual property
7. All real property
8. All other tangible and intangible property and assets of such Loan Party

This collateral description works.[13]  The Note's Exhibit A identifies such things as contracts, permits, and intellectual property and then refers to "all other . . . intangible property," thus again delineating the collateral as general intangibles.[14]

Context drives meaning. In ascertaining the adequacy of the collateral description, we must consider it in the context of the larger transaction. Parallax Enterprises does not own—and never has owned—any property other than its equity interest in Live Oak and other subsidiaries. These are the only general intangibles Parallax Enterprises had to pledge. In the context of a secured transaction between the debtor and the creditor, that description reasonably identifies the collateral securing the Note. Nothing in the record suggests any confusion on that point. Simply put, the parties to the transaction knew what the collateral was and who was getting a security interest in it.  Because (1) the written description reasonably can be read to include the equity interest in Live Oak and (2) the parties actually intended that result, the description suffices to satisfy the objective requirements of UCC sections 9.203 and 9.110.

Parallax Enterprises pledged the only asset it had to secure the Note. The

---

[13] Tex. Bus. & Comm. Code § 9.108(b); *Transamerica Annuity Serv. Corp. v. Symetra Life Ins. Co.*, 4:16-CV-1426, 2018 WL 4620712, at *9 (S.D. Tex. Sept. 19, 2018) (order); *In re Barr*, 180 B.R. 156, 159 (Bankr. N.D. Tex. 1995).

[14] *See Orix Credit All., Inc. v. Omnibank, N.A.*, 858 S.W.2d 586, 591 (Tex. App.—Houston [14th Dist.] 1993, no writ) (restating prior holding that "'catch all' description of tangible property was . . . sufficient to cover the tangible property in dispute"); *see also In re ProvideRx of Grapevine, LLC*, 507 B.R. 132, 162 (Bankr. N.D. Tex. 2014) ("The term 'general intangibles' in a secured transaction acts as a 'catch-all' and brings under Article 9 miscellaneous types of contractual rights and other personal property that are used or normally may be used as commercial security.").

only purpose of the collateral description was to create the security interest in the equity interest in Live Oak. The words contained in the Note sufficed for that purpose because the description made possible the identification of the collateral described.

The majority errs in using the UCC comments to add requirements not contained in the statute. The Note uses "general intangibles" in creating the security interest and in describing the collateral. But even if the Note did not use this term, the Note's use of "intangible property" accomplishes the same thing. The majority's strained construction turns these key words invisible.

In deciding the adequacy of the collateral description, the court should focus on the essentials: the maker of the Note pledged its only asset — intangibles — as security for the debt, identifying the collateral with both the UCC term "general intangibles" and the plain-English equivalent "intangible property." From a functional perspective, these words reflect the parties' intent that the maker's equity interest in Live Oak secure the Note. Read fairly, interpreted reasonably, and construed liberally, these words identify the collateral sufficiently to serve that purpose. That is all the law requires.

The majority's approach of construing the operative UCC term with excessive rigidity goes against the UCC's liberal-construction mandate and undercuts the purpose of the collateral-description provision.[15] Courts must view the UCC as an integrated whole, and give attention to definitions without destroying meaning. In this way, courts serve the UCC's goal of preserving parties' agreements where possible so that the terms parties negotiate control the

---

[15] The official comment explains the purpose of collateral description is evidentiary, "to make possible the identification of the collateral described," and relates a more relaxed approach that "rejects any requirement that a description is insufficient unless it is exact and detailed (the so-called 'serial number' test)." Tex. Bus. & Com. Code Ann. § 9.108 cmt. 2.

contours of their bargain. This approach honors both the intent of the parties and freedom-of-contract principles.[16] Likewise, this approach recognizes that a security interest promotes economic security because it provides the creditor with the promise of repayment by means of the collateral. If the debtor defaults, the creditor should get the benefit of its bargain. By holding parties to their bargains, courts also serve the UCC goal of promoting certainty and predictability in commercial transactions. Today's holding defeats all of these objectives. Worse, it creates a sufficiency yardstick at odds with the very commercial purposes the UCC seeks to achieve.

A common-sense reading of the loan documents and the statute can lead to only one reasonable conclusion: the collateral description suffices to create a security interest in Live Oak's equity. So, the Parallax Parties cannot and did not show a probable right to the relief they sought.

## No Showing of Imminent, Irreparable Injury in the Interim

Even if appellant Cheniere LNG Terminals, LLC were to wrongfully foreclose on Parallax Enterprises' equity interest in Live Oak, any resulting harm or injury could be quantified and remedied through monetary damages. Because Parallax and Live Oak did not meet their burden to establish an inadequate remedy at law, this court should reverse the trial court's order granting a temporary injunction and remand for further proceedings.

Texas courts consider an injury irreparable if the party could not be compensated adequately in damages or if those damages could not be calculated.[17]

---

[16] James J. White & Robert S. Summers, *Uniform Commercial Code* 911 (2d. 1980) (noting that sweeping clauses that give parties to secured transactions the "ability to monopolize collateral — and to have collateral monopolized –comports with freedom of contract.')

[17] *See Butnaru*, 84 S.W.3d at 204; *N. Cypress Med. Ctr. Operating Co., Ltd. v. St. Laurent*, 296 S.W.3d 171, 175 (Tex. App.—Houston [14th Dist.] 2009, no pet.). An adequate remedy at law is one that is "as complete, practical, and efficient to the prompt administration of justice as is

Most of the time money damages suffice to compensate an injured party.[18] Only when the loss at issue is "legally 'unique' or irreplaceable" might damages be found an inadequate remedy.[19] Thus, the law permits trial courts to grant injunctive relief in foreclosure actions involving real property because the law generally views real estate as unique.[20] But, today's case presents a dispute over contract rights, not real property. Courts typically do not enforce contract rights through injunction, because an applicant who may recover breach-of-contract damages rarely can establish an irreparable injury or inadequate legal remedy.[21]

As the applicants in the temporary-injunction hearing, the Paralllax Parties had the burden to prove that their damages cannot be calculated.[22] As the parties opposing the application, the Cheniere Parties did not have to disprove that the Parallax Parties' claimed damages could not be calculated. The Parallax Parties fell short in making the requisite showing. The trial court found in its order that the Parallax Parties demonstrated an imminent, irreparable injury from the planned foreclosure because: (1) Parallax Enterprises would lose ownership and control over assets, including Live Oak, the rights to which are the subject of the parties' claims in the case; and (2) the Parallax Parties would be forced to defend against dismissal of claims that Live Oak has asserted against the Cheniere Parties and against claims that the Cheniere Parties state they intend to assert through Live

---

equitable relief." *Tex. Black Iron, Inc. v. Arawak Energy Int'l Ltd.*, 527 S.W.3d 579, 584 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

[18] *See St. Laurent*, 296 S.W.3d at 175.

[19] *Id.*

[20] *See Butnaru*, 84 S.W.3d at 211 (noting a trial court may grant equitable relief when dispute involves real property); *Pinnacle Premier Props., Inc. v. Breton*, 447 S.W.3d 558, 565 n.10 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (noting real estate is generally considered unique).

[21] *St. Laurent*, 296 S.W.3d at 175.

[22] *Id.* at 177.

Oak. The trial court concluded that injunctive relief was necessary to avoid the Cheniere Parties' performing an act relating to the subject of the pending litigation that would violate the Parallax Parties' rights and tend to render any judgment ineffectual under section 65.011(2).

The Parallax Parties failed to establish an imminent, irreparable injury. The trial court abused its discretion in finding otherwise because any harm resulting from foreclosure on the equity interest in Live Oak can be quantified through monetary damages.

### Loss of Claims Live Oak asserted against the Cheniere Parties

The evidence at the injunction hearing showed that Live Oak has no assets other than its claims in this litigation — claims for damages in the amount of the debt Live Oak claims to have incurred to vendors based on the Cheniere Parties' alleged promises ("Vendor Debt Claim"), rescission or damages for alleged fraudulent inducement of the Note ("Fraudulent-Inducement Claim"), and a declaratory judgment that the Note is properly characterized as equity or does not create an enforceable security interest ("Declaratory Judgment Claims").

### Vendor Debt Claim

The Vendor Debt Claim is for a sum certain. Live Oak's "Accounts Payable Aging Detail" report shows outstanding debt to vendors in the amount of nearly $4.3 million. Whether Cheniere LNG Terminals, LLC or Parallax Enterprises owns Live Oak and thus controls the Vendor Debt Claim does not change the quantifiable value of the claim that would be lost if the Cheniere Parties caused Live Oak to file a nonsuit.

The Parallax Parties assert that foreclosure of Parallax Enterprises' interest in Live Oak would deprive it "of the damages awardable on those claims," which

13

Parallax Enterprises would have to spend money to relitigate on Live Oak's behalf after proving that the foreclosure was unlawful. But the value of the claims lost could be quantified and awarded as damages in this case if it is shown that Cheniere LNG Terminals, LLC wrongfully foreclosed upon the interest.[23] In their reply brief, the Cheniere Parties describe the damages for the wrongful foreclosure as "the amount of vendor charges Live Oak supposedly incurred in reliance on Cheniere's alleged representations for which Parallax Enterprises became liable as a result of the foreclosure." Some courts have held that attorneys' fees are available for obtaining a declaration of wrongful foreclosure.[24] The Parallax Parties produced no evidence that the Cheniere Parties could not pay any such damages and fees.[25]

*The Fraudulent-Inducement and Declaratory-Judgment Claims*

The Parallax Parties argued that if Cheniere LNG Terminals, LLC forecloses, the Cheniere Parties could cause Live Oak to nonsuit the Fraudulent Inducement Claim and the Declaratory Judgment Claims. The Parallax Parties' representative testified that foreclosure may complicate the litigation. Like Live Oak, the other Parallax Parties are either signatories to or guarantors of the Note,

---

[23] *See St. Laurent*, 296 S.W.3d at 177 (reversing injunctive relief because applicant failed to establish his damages could not be calculated, noting expert witnesses frequently offer opinions regarding the value of a partnership interest); *Durkay v. Madco Oil Co., Inc.*, 862 S.W.2d 14, 21 (Tex. App.—Corpus Christi 1993, writ denied) (stating measure of damages for wrongful foreclosure is difference between value of property at time of foreclosure and any indebtedness owed).

[24] *See, e.g., Cadle Co. v. Ortiz*, 227 S.W.3d 831, 837–38 (Tex. App.—Corpus Christi 2007, pet. denied).

[25] *Cf. Tex. Black Iron*, 527 S.W.3d at 587 ("Texas cases hold that a plaintiff does not have an adequate remedy at law if the defendant faces insolvency or becoming judgment proof before trial.").

and they maintain all of the same rights and abilities to rescind, recharacterize, or obtain damages relating to the Note through their own claims against the Cheniere Parties. Thus, whether Live Oak maintains those claims has no effect on the Parallax Parties' right to relief under the Fraudulent Inducement Claims. To the extent Live Oak suffers a separate negative impact from not pursuing these claims, Parallax Enterprises can obtain damages for Live Oak if it proves wrongful foreclosure, as explained above.

*Potential for the Cheniere Parties to Cause Live Oak to Assert Claims*

The Parallax Parties' argument that foreclosure may allow the Cheniere Parties to cause Live Oak to pursue claims against Live Oak's principals—some of whom are also principals of other Parallax Parties—likewise does not support the injunction. Live Oak's principals are not parties to the injunction, and the Parallax Parties have no standing to assert a potential threat of litigation against others as injury to themselves.[26]

The Parallax Parties maintain that the Cheniere Parties could cause Live Oak to assert claims against them and that they have no legal remedy available to recoup the costs of defending against ostensibly frivolous claims. Contrary to these assertions, rules and statutes authorize sanctions against parties for filing frivolous claims.[27] And, the Parallax Parties' apprehensions of what the Cheniere Parties could or might do in the future do not constitute an *imminent*, irreparable injury necessary for injunctive relief.[28]

---

[26] *See Heckman v. Williamson Cty.*, 369 S.W.3d 137, 155 (Tex. 2012) (standing requires showing that plaintiff—rather than a third party or the public at large—was personally injured).

[27] *Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 365 (Tex. 2014).

[28] *See Camp Mystic, Inc. v. Eastland*, 399 S.W.3d 266, 276 (Tex. App.—San Antonio 2012, no pet.) ("fear or apprehension of the possibility of injury is not sufficient; injunctive relief requires the plaintiff to prove the defendant has attempted or intends to harm the plaintiff in the future"

The record contains no evidence that the Cheniere Parties intend to cause Live Oak to assert claims against the Parallax Parties, and any apprehension that they will do so cannot support injunctive relief. [29]

*Loss of Control and Ownership of Live Oak*

The Parallax Parties also point to their claimed loss of continued control and ownership by Parallax Enterprises over its interest in Live Oak as evidence of irreparable injury. In certain scenarios, courts have recognized the existence of an irreparable injury where an applicant will suffer the loss of unique management rights in a company. For example, in *Sonwalkar v. St. Luke's Sugar Land Partnership, L.L.P.*, the First Court of Appeals concluded that unique management rights related to interests in a limited liability partnership supported injunctive relief.[30] The management rights included the right to participate in the selection of governing members of the partnership that could block major actions, such as capital calls.[31] Unlike today's case, *Sonwalkar* involved a potential loss of management rights in an ongoing business that could not "be measured by any certain pecuniary standard."[32] Live Oak has no ongoing business. According to the Parallax Parties, Live Oak's only assets are its claims in this case. Unlike the rights at issue in *Sonwalkar*, the management rights the Parallax Parties cite can be measured in monetary damages. The only evidence of management rights in Live Oak that would be lost concern management of claims in litigation. The value of litigation claims can be measured by a certain pecuniary standard regardless of

---

(internal quotation marks omitted)); *Morris v. Collins*, 881 S.W.2d 138, 140 (Tex. App.—Houston [1st Dist.] 1994, writ denied).

[29] *Morris*, 881 S.W.2d at 140.

[30] 394 S.W.3d 186, 201 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

[31] *Id.*

[32] *Id.*

16

who manages the claims; thus, loss of management does not establish an irreparable injury.[33]

Though Texas law recognizes the propriety of injunctive relief when the enjoined conduct threatens to disrupt an ongoing business,[34] the Parallax Parties presented no evidence at the hearing — and make no argument on appeal— that foreclosing on the equity interest in Live Oak would disrupt any ongoing business.

In the trial court, the Parallax Parties argued that the Cheniere Parties were attempting to gain the ability to manage and control Live Oak by foreclosing on the Live Oak equity interest. The Parallax Parties asserted that even if the Cheniere Parties were to obtain this equity interest by foreclosure, they would not obtain the ability to manage and control Live Oak because under Delaware law the assignment of a limited liability company interest does not entitle the assignee to become a member or exercise the rights of a member. This argument, if correct, only shows that the Cheniere Parties will not obtain control or management of Live Oak upon foreclosure. This argument does not show that the Parallax Parties will lose the ability to manage and control Live Oak or will suffer irreparable injury.

The en banc majority states that, even if the Cheniere Parties would not obtain control or management of Live Oak by foreclosing on the Live Oak equity interest, the Parallax Parties face irreparable harm from the foreclosure because, under title 6, section 18-702(b)(3) of the Delaware Code, foreclosure would cause Parallax to cease to be a member of Live Oak and thus to lose the ability to manage

---

[33] *See St. Laurent*, 296 S.W.3d at 176 (finding no irreparable injury because loss of partnership shares could be measured in monetary damages); *see also Doerwald v. MBank Fort Worth, N.A.*, 740 S.W.2d 86, 90 (Tex. App.—Fort Worth 1987, no writ) (finding no irreparable injury because party to joint venture agreement with 5% interest in profits could be compensated for lost profits measured by pecuniary-loss standard).

[34] *See Sonwalkar*, 394 S.W.3d at 199-200; *Liberty Mut. Ins. Co. v. Mustang Tractor & Equip. Co.*, 812 S.W.2d 663, 666 (Tex. App.—Houston [14th Dist.] 1991, no writ).

and control Live Oak.[35]   The en banc majority also concludes that if Parallax ceases to be the sole member of Live Oak, there would be no members of Live Oak after foreclosure, thus triggering irreparable harm by the automatic dissolution of Live Oak under title 6, section 18-801(a)(4) of the Delaware Code.[36]

First, the Parallax Parties did not assert either of these points in the trial court, so this court should not base its decision on this ground.   Second, the en banc majority does not mention the second sentence of section 18-702(b)(3).[37] The entire subsection provides that, unless otherwise provided in the limited liability company agreement:

> (3) A member ceases to be a member and to have the power to exercise any rights or powers of a member upon assignment of all of the member's limited liability company interest. *Unless otherwise provided in a limited liability company agreement, the pledge of, or granting of a security interest, lien or other encumbrance in or against, any or all of the limited liability company interest of a member shall not cause the member to cease to be a member or to have the power to exercise any rights or powers of a member.*[38]

In its construction of the Delaware statutes, the en banc majority equates the assignment of a limited liability company interest with the foreclosure of a security interest in a limited liability company interest.   But, the plain text of section 18-702(b)(3) shows that the Delaware General Assembly does not treat these terms as equivalent.[39]   The General Assembly determined that unless otherwise provided in the limited liability company agreement, a member's rights as a member cease

---

[35] *Ante* at 17.

[36] *Ante* at 17-18; Del. Code Ann. tit. 6 § 18-801(a)(4).

[37] *See ante* at 17; Del. Code Ann. tit. 6 § 18-702(b)(3).

[38] Del. Code Ann. tit. 6 § 18-702(b)(3) (emphasis added).

[39] *See id*.

when the member assigns the member's limited liability company interest to another party but that a member's rights as a member do not cease when the member grants a security interest in the member's limited liability company interest.[40]  The General Assembly did not provide that a member's rights as a member cease upon foreclosure of a security interest in the member's limited liability company interest.[41]  Thus, the Parallax Parties did not show that Parallax would cease to be a member in Live Oak upon foreclosure of the security interest in the Live Oak equity.  Likewise, the Parallax Parties did not prove that upon foreclosure there would be no members in Live Oak, which might trigger the automatic dissolution of Live Oak under section 801(a)(4).[42]  The evidence before the trial court did not show that Parallax would cease to be a member upon foreclosure of the security interest in the Live Oak equity. So, the Parallax Parties did not show irreparable harm on the ground that Parallax would cease to be a member or on the ground that Live Oak would dissolve automatically.

## Section 65.011

The Parallax Parties also argue that section 65.011(2) of the Texas Civil Practice and Remedies Code authorizes the temporary injunction.  Section 65.011(2) permits a trial court to issue an injunction when a party is about to perform an act relating to the subject matter of pending litigation, in violation of the rights of the applicant, and the act would tend to render the judgment in the case ineffectual.[43]

---

[40] *See id.*

[41] *See id.*

[42] Del. Code Ann. tit. 6 § 18-801(a)(4).

[43] *See* Tex. Civ. Prac. & Rem. Code § 65.011(2); *Topletz v. City of Dallas*, No. 05-16-00741-CV, 2017 WL 1281393, at *4 (Tex. App.—Dallas Apr. 6, 2017, no pet.) (mem. op.) (affirming injunction in part where trial court found conduct of defendants affected core functions of the

Section 65.011(2) does not support the trial court's injunction for two reasons. First, the Parallax Parties failed to show an irreparable injury under section 65.011(2).[44] Second, the statute requires the Parallax Parties to establish that the act of which they complain would render any judgment by the trial court ineffectual. The Parallax Parties argue that allowing Cheniere LNG Terminals, LLC to foreclose on the equity interest in Live Oak under the Note would render a judgment in this case at least partially ineffectual because the trial court ultimately could find that the Cheniere Parties have no rights under the Note, thus allowing the Cheniere Parties to exercise disputed rights before they can be adjudicated. But the Parallax Parties' representative testified that even if Cheniere LNG Terminals, LLC forecloses on Live Oak, Parallax Enterprises would not dismiss its claims against the Cheniere Parties.

Parallax Enterprises does not contend it will be entitled to more money under its claims if it owns Live Oak than if it does not. In other words, Parallax Enterprises' ownership of Live Oak does not affect its ability to pursue its claims regarding the validity of the Note in this lawsuit. Because the Parallax Parties have not shown that the relief they seek would be affected even if the injunction were not issued, they have not shown that the judgment would be rendered ineffectual.[45] As to any injury that Live Oak might suffer from foreclosure, nothing in the record or in the Parallax Parties' argument suggests that monetary damages could not be awarded to compensate for wrongful foreclosure or that any judgment awarding

court).

[44] *See Town of Palm Valley*, 87 S.W.3d at 111 (holding that applicant seeking a temporary injunction under subsection 65.001(1) of the general injunction statute was not exempt from traditional requirement of irreparable harm); *City of El Paso*, 408 S.W.3d at 37.

[45] *See Guillermo Benavides Garza Inv. Co. v. Benavides*, No. 04-13-00453-CV, 2014 WL 3339555, at *4 (Tex. App.—San Antonio July 9, 2014, no pet.) (mem. op.).

those damages would be ineffectual.[46] The cases the Parallax Parties cite involved materially different facts and do not support a temporary injunction under the facts of today's case.[47]

Any damages to the Parallax Parties from the loss of Parallax Enterprises' equity interest in Live Oak can be measured by a certain pecuniary standard.[48] The trial court abused its discretion in finding the Parallax Parties would suffer an irreparable injury where the evidence established any losses could be compensated through monetary damages.[49] Therefore, this court should sustain the Cheniere Parties' second issue.

## III. CONCLUSION

The trial court abused its discretion in granting the temporary injunction because the Parallax Parties did not establish either a probable right to relief or an irreparable injury. This court should reverse the trial court's order granting temporary injunctive relief and remand for further proceedings. Because it does

---

[46] *See Hotze v. Hotze*, No. 01-18-00039-CV, 2018 WL 3431587, at *6 (Tex. App.—Houston [1st Dist.] July 17, 2018, no pet.) (mem. op.) (applicant presented no evidence that judgment rendered against brothers for wrongfully receiving advance payments would be rendered ineffectual).

[47] *See Brazos River Conserv. & Reclamation Dist. v. Allen*, 171 S.W.2d 842, 847 (Tex. 1943) (permitting injunction because allowing separate suit involving same subject matter to go forward would "not afford a remedy as practical and efficient to the ends of justice and its prompt administration as that of injunction"); *Gen. Fin. Servs., Inc. v. Practice Place, Inc.*, 897 S.W.2d 516, 519 (Tex. App.—Fort Worth 1995, no writ) (involving foreclosure on real property); *Trinity Water Reserve, Inc. v. Evans*, 829 S.W.2d 851, 866 (Tex. App.—Beaumont 1992, no writ) (restraining action that could put applicants into bankruptcy because applicants would have no realistic or fully adequate remedy at law).

[48] *See St. Laurent*, 296 S.W.3d at 176 (finding no irreparable injury because loss of partnership shares could be measured in money damages); *see also Doerwald*, 740 S.W.2d at 90 (finding no irreparable injury because party to joint venture agreement with 5% interest in profits could be compensated for lost profits measured by pecuniary loss standard).

[49] *See St. Laurent*, 296 S.W.3d at 176; *Doerwald*, 740 S.W.2d at 90.

21

not, I respectfully dissent.

/s/     Kem Thompson Frost
Chief Justice

En banc court consists of Chief Justice Frost and Justices Christopher, Wise, Jewell, Bourliot, Zimmerer, Hassan, and Poissant. (Spain, J., not participating). Justice Christopher authored the Opinion on Reconsideration En Banc, in which Justices Wise, Bourliot, Zimmerer, Hassan, and Poissant joined. Justice Zimmerer authored the Concurring Opinion on Reconsideration En Banc. Chief Justice Frost authored the Dissenting Opinion on Reconsideration En Banc, in which Justice Jewell joined.